523 N.W.2d 591 (1994)
In the Matter of the RECEIVERSHIP OF the FIRST NATIONAL BANK IN HUMBOLDT, Humboldt, Iowa, A National Banking Association, and Federal Deposit Insurance Corporation, Receiver.
FEDERAL DEPOSIT INSURANCE CORPORATION, Appellant,
v.
IOWA GROWTHLAND FINANCIAL CORP. and Joe Dodgen, Appellees.
No. 93-392.
Supreme Court of Iowa.
October 19, 1994.
As Modified on Denial of Rehearing November 21, 1994.
*592 G. Mark Rice of Adams, Howe & Zoss, P.C., Des Moines, Ann Duross, Asst. Gen. Counsel, Richard J. Osterman, Jr., Sr. Counsel, and Edward J. O'Meara, Counsel to F.D.I.C., Washington, DC, for appellant FDIC.
Thomas D. Hanson, Barry A. Russell, and Lu Ann White of Hanson, Bjork & Russell, Des Moines, for appellees Iowa Growthland Financial Corp. and Joe Dodgen.
Considered by McGIVERIN, C.J., and CARTER, LAVORATO, NEUMAN, and ANDREASEN, JJ.
NEUMAN, Justice.
When the Federal Deposit Insurance Corporation (FDIC), acting as receiver of a failed bank in Humboldt, Iowa, sought a court order terminating the receivership, a controversy arose over a surprising development: a surplus of over $2 million in the receivership estate. The FDIC claimed entitlement to the excess as a "reasonable return" on the funds it advanced in the bailout. The bank's shareholders disputed the government agency's authority to collect interest. The district court, acting in equity, determined that the FDIC was entitled to interest, but only at a rate of three percent. This left over $800,000 available for distribution to shareholders.
On the FDIC's appeal, and the shareholders' cross-appeal, we affirm the court's decision to permit interest, but reverse and remand for entry of an order fixing the rate at five percent per annum in conformity with Iowa Code section 535.2(1) (1993).

I. Background Facts and Proceedings.

In April 1982, the comptroller of the currency declared the First National Bank in *593 Humboldt, Iowa, insolvent and appointed the FDIC as its receiver. The bank's insolvency resulted directly from the theft of more than $16 million of the bank's securities by Gary Lewellyn, son of the bank's president. The theft was discovered by Joe Dodgen, the bank's chairman. Dodgen was also the principal shareholder of Iowa Growthland Financial Corp., the holding company that owned eighty-four percent of the bank's stock.
The FDIC informed Dodgen that two options existed regarding the bank's fate straight liquidation or the arrangement of a "purchase and assumption" transaction. The latter option, authorized by 12 U.S.C. § 1823(c) (1989), permits the FDIC to facilitate the transfer of the insured deposits to a healthy institution. Under such an arrangement, the thriving bank agrees to assume the deposit liabilities as well as certain assets of the failed institution. Because the assumed deposit liabilities greatly exceed the acquired assets, the FDIC pays cash to the assuming bank in an amount sufficient to equalize the assumed assets and liabilities, less some credit for the going concern value of the failed bank.
Although the FDIC initially favored liquidation, Dodgen persuaded it to enter a purchase and assumption agreement with Hawkeye Bankcorp. Under the agreement, Hawkeye Bankcorp paid the receiver a "premium" of $2.1 million for assets purchased and liabilities assumed. The FDIC, acting in its corporate capacity (hereinafter "FDIC" or "FDIC corporate"), then paid the FDIC acting as receiver (hereinafter "receiver") approximately $10 million out of its insurance fund to secure the depositor liability. In exchange for this payment, FDIC corporate acquired the remaining unassumed assets of the failed bank. Its agreement with the receiver provided as follows:
The Corporation agrees that in the event the amounts recovered from the liquidation of the assets so purchased by the Corporation exceeds (1) the consideration paid by the Corporation, (2) the cost of liquidation, and (3) a reasonable return to the Corporation on the amount of the initial cash purchase price and all costs of liquidation paid or incurred by the Corporation, such excess shall be paid to the Receiver. The term "cost of liquidation" as herein employed shall include, without being limited to, the expense of investigation, defending, or prosecuting any claims or litigation and administrative costs.
(Emphasis added.)
In August of 1990, the receiver petitioned the district court to terminate the receivership. It reported that all creditor claims had been fully paid and all unassumed assets liquidated. The liquidation resulted in an excess of nearly $2.3 million over the $10 million originally advanced to Hawkeye Bankcorp. The receiver claimed, however, that FDIC corporate was still owed nearly $7 million, a sum representing eight years' interest at 14.39% on the transferred funds. It therefore asserted that there was no excess available for distribution to the bank's shareholders. Dodgen and Iowa Growthland objected, and the matter was set for hearing.
At the hearing, the FDIC grounded its entitlement to the excess funds on the "reasonable return" language quoted above. A rate of 14.39%, it argued, was reasonable and consistent with the average rate of United States Treasury obligations having a three-year maturity on the date of the purchase and assumption agreement. The shareholders responded that the FDIC was not statutorily entitled to receive interest and, in any event, the interest rate claimed was unreasonable and insupportable under this record.
The district court ruled that the FDIC was entitled to charge interest on the funds it advanced, but the rate of 14.39% bore no relationship to the investment. Balancing the equities in the caseincluding the benefit derived from Dodgen's insistence on purchase and assumption instead of liquidation, and the FDIC's two-year delay in commencing litigation that ultimately resulted in a $7 million recovery for the estatethe court found that an interest rate of three percent was reasonable. This appeal followed.
Because the case was tried in equity, our review is de novo. Iowa R.App.P. 4; Anderson v. Yearous, 249 N.W.2d 855, 858 (Iowa 1977).

*594 II. Interest Entitlement.

The FDIC, created to insure the deposits of member banks and savings institutions, is governed by the Federal Deposit Insurance Act (FDIA). See 12 U.S.C. § 1811. The FDIA directs the FDIC to operate in two separate and legally distinct capacitiesFDIC corporate and FDIC acting as receiver. See Federal Deposit Ins. Corp. v. McClanahan, 795 F.2d 512, 516 (5th Cir.1986); Gunter v. Hutcheson, 674 F.2d 862, 865 (11th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). FDIC corporate functions as an insurer of bank deposits. 12 U.S.C. § 1821(a). Deposits are insured up to $100,000 by FDIC corporate when a federally insured depository institution is closed. Id. Payment of insured deposits is made as soon as possible after an institution's failure either "by cash or by making available to each depositor a transferred deposit ... in another insured depository institution in an amount equal to the insured deposit...." Id.
The FDIC insurance fund is supported by assessments on the deposits of each insured bank, supplemented by earnings on the fund's investment in United States treasury securities. Id. FDIC corporate is also authorized to borrow, with interest, from the federal treasury as necessary to meet its insurance obligations. Id. In order to recoup cash transferred from the insurance fund to an assuming bank, FDIC corporate enters a contract of sale with the FDIC acting as receiver of the failed bank's estate. See id. § 1821(d)(2)(A). The receiver agrees to sell FDIC corporate any unassumed assets for an amount equivalent to the insurance proceeds paid to the assuming bank. Federal Deposit Ins. Corp. v. Bank of Boulder, 911 F.2d 1466, 1470 (10th Cir.1990), cert. denied, 499 U.S. 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). FDIC corporate, as a creditor of the receivership estate, then attempts to recover these assets to minimize loss to the fund. Id.
It is against this backdrop that we consider the parties' claims. The shareholders, Dodgen and Iowa Growthland Financial Corp., assert that the FDIC is barred from collecting interest in the absence of specific statutory authorization. The FDIC counters that its duty to protect the integrity of the insurance fund impliedly, if not expressly, authorizes the recovery of interest. Like the district court, we find the FDIC's interpretation of its mandate persuasive on this point.
The United States Supreme Court has long held the view that allowance of interest on debts owed the government turns on considerations of justice and equity, not explicit statutory authorization. Billings v. United States, 232 U.S. 261, 286, 34 S.Ct. 421, 426, 58 L.Ed. 596, 607 (1914); see Rodgers v. United States, 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92 L.Ed. 3, 6 (1947) (failure to mention interest in statute creating obligation does not manifest unequivocal congressional purpose that obligation shall not bear interest). Moreover, a review of the FDIA suggests that Congress intended the FDIC to collect interest on money advanced to effectuate a purchase and assumption agreement. A pertinent section of the act provides:
Any conservator, receiver, or liquidator appointed for any insured depository institution in default, including the Corporation acting in such capacity, shall be entitled to offer the assets of such depository institutions for sale to the Corporation or as security for loans from the Corporation.
12 U.S.C. § 1823(d)(1) (emphasis added). Under either a sale or loan, the funds advanced by FDIC corporate derive from the bank insurance fund. See id. When these insurance funds are not "otherwise employed" in securing the accounts of insured depositors, the FDIA requires them to be "invested in obligations of the United States or in obligations guaranteed as to principal and interest by the United States." Id. § 1823(a)(1). This provision reflects Congress' intent that money in the deposit insurance fund bear interest in order to protect the fiscal integrity of the fund. See Bank of Boulder, 911 F.2d at 1474 (overarching statutory mandate to FDIC is to minimize loss to insurance fund).
When insurance funds are diverted from investments to finance the liquidation or purchase and assumption of a failed bank, the *595 same concerns for fiscal integrity apply. In the case of a liquidation, the Eighth Circuit Court of Appeals has observed:
Neither the purpose of the Act nor its legislative history evidences any philanthropic intent, in a situation such as this, to allow the use of the Corporation's funds to become a source of profit to stockholders of a defaulting bank, at the expense of the Corporation.... The public is interested in the preservation of the Corporation's solvency, because of the stability to the banking system which the Act was designed to promote, through the protection of deposits, and because of the investment of public funds therein.... It would hardly contribute to the solvency of the fund, or to the protection of the public monies invested, to hold that stockholders of a closed bank were entitled to receive any surplus that remained, from accumulated earnings upon the bank's assets during liquidation, or otherwise, after payment only of the principal amount of the Corporation's claim, without any interest for the period that its funds were outstanding in the liquidation.
Federal Deposit Ins. Corp. v. Citizens State Bank of Niangua, 130 F.2d 102, 104 n. 6 (8th Cir.1942) (citations omitted).
The shareholders tender no persuasive reason to depart from this rationale where the FDIC negotiates a purchase and assumption, rather than a liquidation. Under either proceeding, the FDIC is subrogated to the rights of the depositors. 12 U.S.C. § 1821(g)(1). Even though the purchase and assumption prevented the depositors from suffering a loss of interest on their deposits, the court noted in Niangua that the FDIC's right of subrogation extends to collection of interest "for the period that the bank's obligation for the deposit remains unsatisfied as against the Corporation." Citizens State Bank of Niangua, 130 F.2d at 104 (emphasis added). In other words, the FDIC's statutory subrogation rights entitle it to interest, not based on that accruing to the individual depositors, but upon the unpaid portion of its own claim as a creditor in the receivership proceedings. See In re Liquidation of Anchor State Bank, 234 Wis. 261, 291 N.W. 329, 334 (1940) (subrogation features of FDIC differentiated from general subrogation doctrine to meet congressional concern for solvency of fund); cf. Federal Deposit Ins. Corp. v. De Jesus Velez, 514 F.Supp. 829, 836 (D.P.R.1981), aff'd, 678 F.2d 371 (1st Cir. 1982) (in purchase and assumption transaction, payment to debenture holders subordinated to FDIC pending full recovery of cash infused to facilitate purchase, "plus interest and the costs of collection").
In sum, the contractual provision for the recovery of interest on money from the insurance fund used by the FDIC to meet its statutory deposit insurance obligations is meant to support the financial integrity of the insurance fund. Since Congress has mandated that money in the insurance fund must be invested in treasury securities bearing interest, the statutory scheme leads by necessary implication to the conclusion that Congress not only authorized FDIC corporate to recover interest on the use of money from the insurance fund, but in fact made it FDIC corporate's fiduciary duty to do so. The district court's decision on this issue is, therefore, affirmed.

III. Interest Rate.

The question remains what interest rate the FDIC is entitled to recover. The contract between FDIC corporate and the receiver merely stipulated that FDIC corporate should receive a "reasonable return" on the use of its insurance funds. The parties disagree on the meaning of reasonable return. Consistent with the argument that it is required to invest insurance funds in treasury securities, the FDIC contends that the average rate of United States treasury bills with three-year maturities outstanding on the date of the purchase and assumption transaction14.39%is reasonable. In the alternative it urges the application of the five percent rate under Iowa Code section 535.2(1)(g).[1] In either case, no surplus would remain for distribution to the shareholders.
*596 The shareholders argue that, if the FDIC is entitled to any interest, the court's award of three percent is reasonable and should be upheld. The court's ruling rested on a finding that the equities favored a nominal interest rate that would preserve some of the surplus for distribution to the stockholders.
It is well established that equity jurisdiction allows the court the necessary flexibility to determine the equities between the parties. Farmers Sav. Bank v. Gerhart, 372 N.W.2d 238, 245 (Iowa 1985). Courts of equity are, however, bound by statute. Mensch v. Netty, 408 N.W.2d 383, 386 (Iowa 1987). Equity must follow the law in the absence of fraud or mistake. Id.
We concur in the court's decision to reject FDIC's claim that the rate of 14.39% represents a "reasonable return" on insurance fund money used to facilitate the purchase and assumption. The rate urged by the FDIC bears no relationship to the value of funds invested over the eight-year period of the receivership. It merely represents the market value of United States treasury securities with a three-year maturity outstanding in April 1982.
We are similarly unconvinced, however, that a principled basis exists to set the rate beneath the five percent prescribed by section 535.2(1)(g) for contracts having no stipulated rate. The court's generosity toward the shareholders rested largely on its finding that the FDIC neglected its fiduciary duties to the estate by failing to promptly commence suit against United Central Bank of Des Moines (UCB), the institution that held the failed bank's securities and transferred them to Lewellyn. The finding rested solely on speculation by Dodgen that the suit (which ultimately netted $8 million to the receivership) could have been brought two years earlier but for FDIC's concern that it would have driven UCB into bankruptcy. On cross-examination, Dodgen admitted having no knowledge of other issues bearing on the litigation's timing. He conceded that the delay, rather than harming the receivership, may have actually enhanced the prospect of recovery. These concessions, we believe, greatly weaken the court's finding that the receivership suffered from the lawsuit's timing.
The court also credited Dodgen with successfully persuading the FDIC to pursue a purchase and assumption rather than liquidation, a decisionthe court foundthat saved the receivership from suffering a potential $7 million loss. Like the court's finding with respect to the lawsuit, however, this conclusion necessarily rests on speculation about the result of an unpursued course of action. Given the lack of proof to support these findings, we believe equity demands adherence to the statutory interest rate of five percent.
We do believe the court correctly ruled that the FDIC is entitled only to interest on the funds advanced pursuant to the purchase and assumption agreement, not other receivership expenses. Interest runs from the time money becomes due and payable. Thomas Truck & Caster Co. v. Buffalo Caster & Wheel Corp., 210 N.W.2d 532, 536 (Iowa 1973). Accordingly, we affirm in part and reverse in part and remand to the district court for entry of judgment in conformity with this opinion.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] The statute provides:

[T]he rate of interest shall be five cents on the hundred by the year in the following cases....
....
g. Money due, or to become due, where there is a contract to pay interest, and no rate is stipulated.
Iowa Code § 535.2(1)(g). The parties concede that although federal law governs this suit, see 12 U.S.C. § 1819(b)(2)(A), in the absence of a federal statute prescribing the interest rate we may incorporate state law not otherwise in conflict with federal policies governing bank liquidation. Federal Deposit Ins. Corp. v. Palermo, 815 F.2d 1329, 1334 (10th Cir.1987).