Bill SWEAT, Plaintiff–Appellant,

v.

PEABODY COAL COMPANY,
Defendant–Appellee.

No. 95–2341.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1996.

Decided Aug. 23, 1996.

Donald V. Ferrell, Thomas J. Foster, Michal Doerge (argued), Jelliffe, Ferrell & Morris, Harrisburg, IL, for Plaintiff–Appellant.

Kenneth V. Byrne (argued), Latourette, Schlueter & Byrne, St. Louis, MO, for Defendant–Appellee.

Before CUDAHY, FLAUM, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Over the course of his career at the Peabody Coal Company, Bill Sweat was injured three times. After each instance, Peabody's workers' compensation insurance paid for Sweat's medical bills and for salary continuance while he missed work during his recovery. But the day Sweat was to return to work after recovering from his most recent injury, his employment was terminated. Sweat subsequently filed adjustment claims for workers' compensation benefits relating to his second and third injuries. He then filed this diversity action seeking to recover damages for the Illinois tort of retaliatory discharge, contending that Peabody fired him as a result of his exercising his rights under the Illinois Workers' Compensation Act, 820 ILCS 305/1 *et seq.* After difficulties during discovery, Sweat's counsel filed a motion for sanctions against Peabody. Sweat also filed a belated demand for a jury trial, and Peabody filed a motion for summary judgment. The district court issued an opinion granting summary judgment in favor of Peabody and dismissing Sweat's other motions, and we affirm.

## I. HISTORY

Sweat first went to work for Peabody Coal in August of 1978. At all times relevant to this lawsuit, Sweat was not employed under a union contract—he was an employee at will. In 1982, Sweat suffered a work-related knee injury that required him to undergo two surgeries. After these medical procedures were completed, Sweat was contacted by Peabody's workers' compensation insurance carrier, who inquired whether he wished to retain an attorney to represent him concerning his right to benefits. Sweat indicated that he did not, and the insurance carrier offered him a sum of money as settlement for any potential workers' compensation claim he might file as a result of his injury. Sweat accepted the settlement offer and returned to work, where over the next four and a half years he received several raises and more than one promotion.

On December 12, 1987, Sweat injured his head and neck when, while riding along a track in a mine car, he struck his head on a low-hanging roof bolt. Sweat reported the incident to his supervisor and filed an accident report with Peabody's workers' compensation insurance carrier. The insurance company issued checks to cover his medical bills, and it paid him an interim salary from the time of the injury until he was cleared by his doctor to return to work on May 22, 1988. After returning to work, Sweat continued to receive raises and was promoted to the position of safety supervisor.

Almost one year to the day after his 1987 injury, on December 14, 1988, Sweat suffered

another head injury from striking a (we presume, different) loosened roof bolt while riding along in another mine car. Sweat again filed an accident report with Peabody's insurance carrier, and the insurance company covered his medical bills and paid him an interim salary while he was off work for nearly six months. On June 12, 1989, Sweat's doctor declared him fit to resume working, and upon hearing this news Peabody instructed him to report for work at midnight on June 13.

Here is where the story takes a strange turn. Only hours before Sweat was to return to work on June 13, 1989, he was terminated by Peabody despite Peabody's having told him only one day earlier that he was to return to work post haste. Sweat's termination papers indicate that he was let go pursuant to a reduction in force. But Sweat disputes that Peabody was undergoing any force reduction: first, because Peabody did not engage in the type of employee evaluation review that it customarily performs prior to a reduction in employees, and second, because on the day Sweat was scheduled to resume working in 1989, the mine employed exactly the same number of safety supervisors (three) that it had when Sweat was injured in 1988.

Interestingly enough, Peabody's management similarly denies that it was reducing its force in June of 1989. Donald Kintsler, the general superintendent of (among others) the Peabody mine where Sweat was employed, testified that Sweat had not wanted to return to work at the mine but had instead wanted to pursue outside interests (Sweat owned a restaurant and lounge called the Silver Fox). Kintsler explained that because severance pay is available only to employees who are terminated and not to those who voluntarily leave, employees wishing to resign are sometimes offered the chance to be discharged so that they can receive a severance package. He claimed that Sweat's termination, although labeled as part of a reduction force, was in fact a clever ruse allowing Sweat to quit and still pocket roughly $16,000 in severance benefits.

Shortly after leaving Peabody's employ, Sweat retained Charles Stegmeyer as his attorney. In July of 1989, Sweat filed a claim for workers' compensation benefits concerning the 1988 injury, and then in January of 1990, he filed another workers' compensation claim seeking benefits for the 1987 injury.

In 1991, Sweat brought the lawsuit that forms the basis of this appeal in the Circuit Court of St. Clair County, Illinois, alleging that he was discharged as retaliation for his exercise of rights under the Illinois Workers' Compensation Act. Specifically, the complaint charged in relevant part:

6. Plaintiff filed a Workmans Compensation claim against Defendant on [sic] July, 1989.

7. On June 12, 1989 Plaintiff was ready to return to work after recovery from his injuries from [the] work related incident.

8. On June 12, 1989 the Defendant ... advised Plaintiff that he was terminated. The Plaintiff's discharge from his employment was a direct result of the Plaintiff's claim of workman's compensation relief against Defendant.

Stegmeyer did not file a jury trial demand along with the complaint.

Peabody removed the case to the Southern District of Illinois based on diversity jurisdiction, and then later, on Peabody's unopposed motion, venue was transferred to the Western District of Kentucky. However, except for moving from place to place, nothing much happened concerning this lawsuit until mid–1993: Peabody did not file an answer, and Stegmeyer did little to advance the prosecution. As a result, in June of 1993, Sweat obtained new counsel, the law firm of Jelliffe, Ferrell & Morris. The firm successfully got the case transferred back to the Southern District of Illinois on July 28, 1993, and Peabody filed its answer on August 2.

On September 8, 1993, the district court entered a scheduling order setting April 14, 1994, as the cutoff for all discovery. But discovery did not go smoothly. Sweat's counsel claimed that Peabody repeatedly failed to answer interrogatories and requests for production and that it refused to produce witnesses for depositions. Peabody, on the other hand, maintained that Sweat's requests

for written discovery and for the production of deposition witnesses were so broad as to be impossible with which to comply. When things had gotten nowhere by April 14, Sweat's counsel filed a motion to compel discovery, and the district court issued an order on May 12, 1994, requesting the parties' cooperation and directing Peabody to comply with Sweat's discovery requests.

Immediately thereafter, Sweat served notices of deposition on Peabody. When Peabody's counsel and the requested witnesses did not appear at the prescribed place and time, Sweat's counsel filed a motion for sanctions based on Peabody's failure to comply with discovery. Peabody's counsel claimed in its defense, however, that after being served it left numerous answering machine messages for Sweat's counsel trying to explain scheduling conflicts, but that none of these messages were returned.

Soon after filing its motion for sanctions, Sweat's counsel filed a motion for leave to demand a jury trial, claiming that it had just learned of Stegmeyer's failure to request one. Peabody then filed a motion for summary judgment. On March 13, 1995, the district court issued its opinion granting summary judgment in favor of Peabody, denying Sweat's jury demand as untimely, and denying Sweat's motion for sanctions because the district court was unable to determine which party warranted blame for the difficulties with discovery. Sweat appeals to this court, challenging all three of the district court's rulings.

## II. ANALYSIS

### A. Peabody's Motion for Summary Judgment

■ We review a district court's grant of summary judgment *de novo*, drawing our own conclusions of law and fact from the record before us. *Thiele v. Norfolk & Western Ry. Co.*, 68 F.3d 179, 181 (7th Cir.1995). Under this plenary standard, we look to whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." FED.R.CIV.P. 56(c).

■ In determining whether there exists a genuine issue of material fact, we will neither resolve the parties' factual disputes nor weigh conflicting evidence. Rather, we consider all facts in the light most favorable to the nonmoving party, resolving all inferences in his favor. *Tolentino v. Friedman*, 46 F.3d 645, 649 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995). Yet, despite this favorable treatment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). He must demonstrate the presence of a *genuine* factual issue for trial. The nonmovant fails in this task "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party...." *Id.* at 587, 106 S.Ct. at 1356. If no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law. *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1014–15 (7th Cir. 1996).

■ In general, an employer may terminate an at-will employee for any reason or even for no reason at all. *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir.1994) (citing *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 563–65, 384 N.E.2d 353, 357–59 (1978)). The Illinois courts, however, have recognized the tort of retaliatory discharge as an exception to this general rule where an employee is terminated for exercising his rights under the Illinois Workers' Compensation Act. *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 14–15, 421 N.E.2d 876, 877–78 (1981).

■ To succeed on such a claim, the plaintiff must demonstrate: (1) that he was an employee of the defendant prior to his injury; (2) that he exercised a right guaranteed by the Illinois Workers' Compensation Act; and (3) that his discharge was causally related to his exercise of that right. *Kelsay*, 23 Ill.Dec. at 563–65, 384 N.E.2d at 357–59.

The parties do not dispute that Sweat was employed by Peabody before and at the time of his injuries, nor that Sweat filed claims for disability benefits based on his injuries. Summary judgment in this case revolves completely around whether Sweat has demonstrated a genuine issue of fact concerning the necessary causal relationship.

In his complaint, Sweat alleges that "Plaintiff filed a Workmans Compensation claim against Defendant on [sic] July, 1989," and that "[t]he Plaintiff's discharge from his employment was a direct result of the Plaintiff's claim of workman's compensation relief against Defendant." Thus, on its face, the complaint appears to charge that Sweat was fired in retaliation for filing the July 1989 claim for benefits. Of course, such an assertion would be impossible to prove because Sweat did not file this claim until after he had already been terminated, and thus he could not have been terminated as a result of his filing the claim. *See Roger*, 21 F.3d at 149.

Nevertheless, because the language of the complaint states that Sweat's termination was "a direct result of the Plaintiff's claim," as opposed to "a direct result of the Plaintiff's *filing* the claim," we, like the district court, will afford the complaint a more liberal construction. The Illinois courts have recognized instances of retaliatory discharge not only where the plaintiff is fired for filing a workers' compensation claim, but also where the plaintiff is preemptively fired in order to prevent him from filing a claim under the Act. *See Richardson v. Illinois Bell Tel. Co.*, 156 Ill.App.3d 1006, 109 Ill.Dec. 513, 515–16, 510 N.E.2d 134, 136–37 (1987); *Wolcowicz v. Intercraft Indus. Corp.*, 133 Ill.App.3d 157, 88 Ill.Dec. 431, 434, 478 N.E.2d 1039, 1042 (1985).

But Sweat's claim fails under even this more expansive reading. The district court found, and we agree, that Sweat has not adduced any evidence at all supporting the contention that Peabody terminated him in order to deter him from filing his claims. There is no evidence in the record that Peabody knew or even suspected that Sweat might file a workers' compensation claim. *See Roger*, 21 F.3d at 149–50 ("Factual support that the employer was informed or in some way found out about the plaintiff's intent to pursue relief under the Act is essential to a retaliatory discharge action."). In fact, it is undisputed that Sweat did not retain an attorney or consider filing a claim for benefits until after he had already left work. Even if, for some reason, Peabody had predicted that Sweat might make a filing that he himself had not yet considered making, the evidence does not give any indication that Peabody might fire Sweat in an attempt to prevent his doing so. Thus, Sweat has failed to demonstrate a genuine issue of fact concerning whether Peabody's terminating him was causally related to his filing, or even his intention to file, a claim under the Act.

On appeal, Sweat has taken a new tack, asking that we read even more into his complaint. He now argues that drawing medical bill payments and salary continuance from Peabody's workers' compensation insurance carrier during his recovery period was an exercise of his rights under the Act, and that Peabody terminated him as a result of his receipt of these monies. First of all, this argument must fail because it stretches the language of Sweat's complaint beyond the breaking point. The fact that Sweat received an interim salary and payments for his medical bills was not even mentioned in the complaint; the complaint's only reference to benefits whatsoever was its allegation of the July 1989 filing. As a result, no plausible reading of the complaint's language, no matter how broadly it is construed, can encompass the contention that Peabody fired Sweat for receiving these other benefits.

Secondly, even had Sweat's complaint alleged that his termination was a result of his receiving medical payments and salary continuance, he could not survive summary judgment. Sweat has failed to point to any evidence in the record supporting a causal relation between his discharge and *any* exercise of his rights under the Act—even ones unmentioned in his complaint. Sweat attempts to create a genuine issue of fact by pointing to the discrepancies between his termination papers (which say he was let go due to a reduction in force) and the testimony of Kintsler (who claims that there was no

reduction in force, but that Sweat wanted to leave voluntarily). Sweat argues that because Peabody's proffered reason for firing him does not hold water, we must assume that he was fired in retaliation for exercising his rights under the Act.

But this, however, is an assumption we cannot make. The tort of retaliatory discharge is not a discrimination claim. The Illinois courts do not employ a *McDonnell Douglas*-type mechanism of indirect proof, under which if Sweat demonstrates that he was exercising a protected right and that he was fired, a presumption of retaliatory discharge is created and the burden of production is shifted onto Peabody to articulate a legitimate, nonretaliatory explanation for his termination. Rather, "[b]ecause an employer can discharge an at-will employee for any reason at all, it need not provide a legitimate reason for its decision to discharge unless the employee proffers sufficient evidence from which a reasonable jury could infer that the employer was improperly motivated." *Roger*, 21 F.3d at 149 (citing *Cannella v. Nationwide Carriers, .Inc.*, 687 F.Supp. 362, 365 (N.D.Ill.1988); *Austin v. St. Joseph Hosp.*, 187 Ill.App.3d 891, 135 Ill.Dec. 364, 367, 543 N.E.2d 932, 935 (1989)). By arguing that Peabody's stated reason for his termination is pretextual as an attempt to remedy his own inability to produce any evidence that Peabody fired him for exercising his rights under the Act, Sweat has put the cart before the horse, and the district court was correct in awarding Peabody summary judgment.

B. Sweat's Motion for Sanctions and Motion for Leave to Demand a Jury Trial

Having affirmed the district court's grant of summary judgment in favor of Peabody, the issue concerning whether the district court erred in denying Sweat's motion for leave to demand a jury trial is moot. Sweat has not survived the summary judgment stage of litigation, and thus he will never have the opportunity to air his claim at a trial, whether before the bench or a jury.

▮▮▮ We turn lastly to Sweat's motion urging the district court to assess sanctions against Peabody, pursuant to FED.R.CIV.P. 37(b)(2), (d). We note that the district court's power to levy sanctions against court participants so as to effectuate compliance with the court's discovery directives inheres in its role as administrator of the litigation. As such, the decision whether to exercise this discretionary power is particularly appropriate for deferential appellate review, and we will not reverse a district court's determination concerning the award of sanctions unless we are convinced that it has abused its discretion. *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 670 (7th Cir.1996). In this case, the record reflects a discovery phase in which the parties' respective counsel were combative, obstinate, and wholly uncooperative in the process of exchanging information pertinent to the litigation. Sweat's counsel claimed that Peabody was continuously dragging its feet, refusing to comply with various discovery requests. On the other hand, Peabody's counsel complained that Sweat's demands were unrealistic and that Sweat's counsel declined to be flexible concerning the scheduling and timing of Peabody's compliance. From the record, we cannot discern whether either party possesses a monopoly on the contumacious conduct displayed in this dispute. The district court here occupied a far better position than we from which to assess fault between the parties. Nevertheless, the district court explained in an order: ·

> [T]his Court cannot determine where the fault in this latest breakdown of attempted discovery lies. The Court is therefore assuming that both attorneys have failed in this regard.
>
> This Court is not happy with the progress, or should say lack of progress, relating to getting this case ready for trial. It is apparent that the attorneys involved in. this case do not like each other, do not get along, and will not cooperate in the discovery process. The people who suffer when this happens are the parties.

Under the circumstances, we cannot say that the district court abused its discretion by denying Sweat's motion to impose sanctions against Peabody.

The judgment of the district court is AFFIRMED.