**GOLDEN PACIFIC BANCORP, for its own account and derivatively on behalf of and in the name of Golden Pacific National Bank, Plaintiff–Appellant,**

Golden Pacific Bancorp, Counter–Defendant–Appellant,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity and in its capacity as receiver for Golden Pacific National Bank, Defendant–Appellee,**

Federal Deposit Insurance Corporation, Counter–Claimant.

Docket No. 03–6194.

United States Court of Appeals, Second Circuit.

Argued: June 7, 2004.

Decided: July 14, 2004.

Elliot H. Scherker, Greenberg Traurig, P.A., (Julissa Rodriguez, Greenberg Traurig, P.A., Miami, FL, Tucker Byrd, Greenberg Traurig, P.A., Orlando, FL, Simon Miller, Greenberg Traurig, LLP, New York, NY, and Paul A. Batista, New York, NY, on the brief), Miami, FL for Appellant.

Lawrence S. Hirsch, Thelen, Reid & Priest (Ann S. DuRoss, Colleen J. Boles, J.

Scott Watson, and Alan L. Spear, Washington, D.C., on the brief), New York, New York, for Appellee.

Before: MINER and RAGGI, Circuit Judges, and MARRERO, District Judge.*

MARRERO, District Judge.

This lawsuit arises from the Federal Deposit Insurance Corporation's ("FDIC") June 1985 liquidation of the Golden Pacific National Bank (the "Bank"), which was based in Manhattan's Chinatown neighborhood. The Bank's holding company, plaintiff Golden Pacific Bancorp ("Bancorp"), alleges that the FDIC should never have liquidated the Bank in the first place, and, to make matters worse, that the FDIC chose the most expensive liquidation method possible. Bancorp further alleges that the FDIC wastefully charged certain expenses to the receivership estate, and that, when the Bank's creditors were finally paid, the FDIC depleted the remaining estate by improperly paying itself interest on the insurance funds it had disbursed to depositors on the Bank's behalf. Bancorp seeks to recover against the FDIC under theories of unjust enrichment, breach of fiduciary duty, and corporate waste. The District Court granted the FDIC summary judgment on all claims.

The primary issue on appeal is whether the FDIC, as subrogee to the claims of a failed bank's FDIC-insured depositors, may collect post-insolvency interest on those claims from the failed bank's estate. We hold that such interest payments are not improper. We also hold that Bancorp's evidence suggesting that the FDIC breached its fiduciary duties by choosing an expensive wind-up method is too speculative to defeat summary judgment. Fi-

nally, we hold that Bancorp lacks standing to pursue certain waste claims because the Bank's outstanding obligations to a senior creditor, the Internal Revenue Service ("IRS"), would preclude any potential recovery for Bancorp. Accordingly, the judgment of the District Court is affirmed.

## I. BACKGROUND

On June 17, 1985, officials from the Office of the Comptroller of the Currency ("OCC") and the FDIC, acting upon an informant's tip, conducted a surprise examination of the Bank for the purpose of scrutinizing certain custodial certificates—known for their color as "yellow CDs"—which the Bank had been issuing to its customers. The Bank maintained that the yellow CDs were actually investments placed with the Bank as agent, as opposed to deposits (i.e., liabilities) of the Bank. The Bank also told OCC officials that, even if the yellow CDs were considered liabilities, they were backed by sufficient assets to maintain the Bank's solvency. The OCC disagreed on both points, and, by the end of the week, closed the Bank and declared it insolvent.

The FDIC insured the Bank's depositors, and the OCC appointed the FDIC also to serve as the Bank's receiver. The FDIC's dual roles as insurer and receiver arise by statutory design, and it is not uncommon for the FDIC to serve in both capacities with respect to a single bank liquidation. *See FDIC v. Bernstein*, 944 F.2d 101, 106 (2d Cir.1991); *see also Tex. Am. Bancshares, Inc. v. Clarke*, 954 F.2d 329, 335 (5th Cir.1992) ("The separateness of these dual identities of the FDIC has been well respected by federal courts.").

* The Honorable Victor Marrero, United States District Judge for the Southern District of New York, sitting by designation.

As insurer, the FDIC was statutorily required to either pay depositors the insured amounts in cash, or to make the depositors' accounts available up to the insured amounts through another FDIC-insured bank. *See* 12 U.S.C. § 1821(f)(1) (1982). In this case, the FDIC chose to address virtually all of its insurance obligations by soliciting bids from financially healthy banks to enter into a so-called Deposit Insurance Transfer and Asset Purchase Agreement ("DITAPA"). Under a DITAPA, the healthy bank agrees to purchase certain of the failed bank's assets at a premium in exchange for the FDIC making the insured deposits of the failed bank available through the healthy bank (which presumably is interested in the depositors' business).

The FDIC ultimately entered into a DITAPA with the only bidder, Hong Kong and Shanghai Banking Corporation ("HKSB"), which paid a premium of over $6 million and agreed to purchase approximately $61 million of the Bank's assets. The FDIC covered its remaining insurance obligations (pertaining to the Bank's various loan production offices outside New York) either through a similar arrangement or by direct payment. By the end of 1986, the FDIC had paid over $140 million in insurance claims, virtually all of which went to HKSB as the Bank's paying agent under the DITAPA.

By statute, the FDIC was subrogated to the claims of insured depositors to the extent of the FDIC's insurance payments. *See* 12 U.S.C. § 1821(g) (1982). Beginning in July 1986, the FDIC, as receiver, began repaying its creditors, the largest of which was itself, as insurer, for having covered the insured deposits. By early 1990, the FDIC had repaid the amount of all principal owed to all the Bank's creditors.

The FDIC then began to make interest payments to creditors. Based upon New York's nine-percent statutory judgment rate, the FDIC determined that it owed itself approximately $23 million and that it owed non-FDIC creditors approximately $2.8 million.[1] By mid–1994, those creditors had received just under half of the interest payments owed. The FDIC inactivated the receivership in 1995.

Bancorp initiated this lawsuit in 1995, seeking to recover against the FDIC, in both its corporate capacity as insurer and in its capacity as the Bank's receiver, under theories of unjust enrichment, breach of fiduciary duty, and corporate waste. Bancorp contends that the June 1985 "regulatory ambush" rashly dubbed the Bank insolvent in the face of clear evidence to the contrary. *See* Am. Compl. ¶ 35.[2] Bancorp alleges that the FDIC breached its fiduciary duty to the Bank by continuing with the liquidation in light of that evidence and by choosing, before performing

1. The record indicates that there are hundreds of non-FDIC creditors, including, for example, a cleaning company, a newspaper service, and an office supply company, all of which presumably had some business relationship with the Bank before it closed. There are also hundreds of individual creditors, some of whom presumably were depositors who had deposits with the Bank exceeding the insured amount.

2. In 1985, Bancorp unsuccessfully sued the OCC to obtain declaratory relief and damages in connection with the OCC's allegedly erroneous solvency determination. *See Golden Pac. Bancorp v. Clarke*, 837 F.2d 509 (D.C.Cir. 1988). The Court of Appeals held that the OCC's solvency determination involved the type of discretionary judgment for which the government retained sovereign immunity under the Federal Tort Claims Act. *See id.* at 512 ("[T]he decision to close the Bank—made after a week of examination and in the face of a run of withdrawals—could not possibly be thought of as other than a discretionary act that was committed by Congress to the [OCC's] judgment.").

the customary cost evaluation, to wind up the bank by the very costly DITAPA method.

Bancorp also asserts that the FDIC breached its fiduciary duties and was unjustly enriched by awarding itself interest on its insurance payout. Bancorp contends the interest award was improper altogether and, in any event, excessive. Finally, Bancorp claims that the FDIC was wasteful in charging certain expenses to the receivership, such as professional fees and travel fees, and in paying itself the allegedly excessive interest.

In the two opinions that are the subject of this appeal, the District Court granted the FDIC summary judgment on all claims. *See Golden Pac. Bancorp v. FDIC*, No. 95 Civ. 9281, 2003 WL 21496842 (S.D.N.Y. June 27, 2003); *Golden Pac. Bancorp v. FDIC*, No. 95 Civ. 9281, 2002 WL 31875395 (S.D.N.Y. Dec.26, 2002).[3]

## II. STANDARD OF REVIEW

On appeal, we review the District Court's grant of summary judgment *de novo*. *See Golden Pac.*, 273 F.3d at 514. The Court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

We first look to the substantive law of the action to determine which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if the parties dispute material facts, summary judgment will be granted unless the dispute is "genuine," *i.e.*, unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505.

Where, as here, the non-moving party would bear the burden of persuasion at trial, the moving party must first make a *prima facie* case by either identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact" or "pointing out ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After such a *prima facie* showing, the non-moving party must respond with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To this end, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998). In other words, "[w]hen the moving party has carried its burden under

---

**3.** At the outset of this lawsuit, the District Court denied the FDIC's motion to dismiss, which contended, among other things, that the Federal Tort Claims Act's exhaustion requirement barred Bancorp's claims and that the Administrative Procedure Act deprived the Court of jurisdiction. *See Golden Pac. Bancorp v. FDIC*, No. 95 Civ. 9281, 1997 WL 626374, at *1–2 (S.D.N.Y. Oct.7, 1997). However, the District Court later granted the

FDIC summary judgment on the ground that the claims were barred by a 1988 release between the parties, and because the statute of limitations had lapsed. *See Golden Pac. Bancorp v. FDIC*, No. 95 Civ. 9281, 2000 WL 776928, at *4–5 (S.D.N.Y. June 15, 2000). This Court reversed on both points. *See Golden Pac. Bancorp v. FDIC*, 273 F.3d 509 (2d Cir.2001). These issues are not relevant to the present appeal.

Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted).

Throughout this inquiry, the Court must credit the non-moving party's evidence and draw all justifiable inferences in favor of that party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## III. DISCUSSION

### A. *THE LIQUIDATION METHOD*

 In its capacity as receiver, the FDIC "steps into the shoes of the failed bank" and "has a responsibility to marshal the assets of the bank and to distribute them to the bank's creditors and shareholders." *E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 595 (D.C.Cir.1994). Generally speaking, a receiver "owes a duty of strict impartiality ... to all persons interested in the receivership estate," and also must "endeavor to realize the largest possible amount for assets of the estate." *Phelan v. Middle States Oil Corp.*, 154 F.2d 978, 991 (2d Cir.1946) (internal quotation marks omitted).[4] It is undisputed that, as a receiver, the FDIC owes a fiduciary duty to the Bank's creditors and to Bancorp.[5] *See Golden Pac.*, 273 F.3d at 519. Bancorp argues that the FDIC breached that duty by mismanaging the receivership and leaving Bancorp's shareholders with nothing.

Bancorp contends that the FDIC's first mistake was ignoring the fact that the Bank was actually solvent when the FDIC took over. As evidence of the Bank's solvency, Bancorp points to the FDIC's own balance sheets and an independent auditing firm's report showing that the Bank was solvent before the FDIC entered into the DITAPA. Bancorp also emphasizes that the IRS had determined that the Bank was solvent in 1985 and had attempted, against FDIC resistance, to collect taxes accordingly. The FDIC and IRS ultimately settled the matter, on terms that Bancorp contends are premised on the Bank having actually been solvent in 1985.

 Bancorp's complaint faults the FDIC for putting the Bank into receivership in light of the evidence of solvency. This allegation ignores that the FDIC was precluded by statute from refusing to accept the receivership appointment or otherwise attempting to undo the OCC's solvency determination. *See* 12 U.S.C. §§ 191, 1821(c) (1982). At oral argument, Bancorp's counsel conceded this point. Bancorp nevertheless maintains that the FDIC, knowing that the Bank could cover its debts, should have proceeded on a less drastic course, such as simply continuing to operate the Bank, creating a new "bridge bank" to manage the Bank's operations, or entering into a so-called purchase and assumption ("P & A") agreement with a healthy bank. A P & A resembles a merger but is "structured as a purchase of assets (that is, loans) and assumption of liabilities (that is, deposits) of the failing bank by the acquiring bank, with the FDIC making up the shortfall between the value of the liabilities as-

---

**4.** We assume, as the parties have done, but do not decide, that the scope of the FDIC's fiduciary duties is governed by New York law, and is no different from that of any other trustee or receiver.

**5.** We have previously recognized that the FDIC, as receiver, has "broad discretion in the disposition of its assets." *Gosnell v. FDIC*, 938 F.2d 372, 376 (2d Cir.1991). Because Bancorp presents virtually no evidence that the FDIC acted improperly, we need not address here whether and to what extent the FDIC's fiduciary relationship to Bancorp limits that statutory discretion.

sumed and the assets purchased." III Michael P. Mallow, *Banking Law and Regulation* § 11.3.2., at 11.24 (2004); *see also FDIC v. Merchants Nat'l Bank of Mobile*, 725 F.2d 634, 637–38 (11th Cir. 1984) (describing a P & A). *See generally* Barry S. Zisman & Marquerite N. Woung, *The Superpowers of the FDIC/RTC and Their Availability to Third Parties*, 108 Banking L.J. 516, 519–23 (1991) (discussing the various alternatives available to the FDIC in dealing with failed financial institutions).

We agree with the District Court that Bancorp's arguments are unsupported and unavailing. As an initial matter, the statutory scheme at the time of the liquidation evinced a careful division of labor between the OCC and the FDIC: the OCC determined whether a bank was insolvent and, if so, the FDIC was required to wind up the bank and cover its insurance obligations. *See* 12 U.S.C. § 1821(c) (1982) (stating that, after the OCC determined an insured bank was insolvent, the OCC "shall appoint the [FDIC] receiver"); *id.* § 191 (stating that an appointed receiver "shall proceed to close up" an insolvent bank); *id.* § 1821(f) (stating that "payment of the insured deposits ... shall be made by the [FDIC] as soon as possible").[6] To the extent Bancorp suggests that the FDIC should have done anything short of an immediate wind-up of the Bank, the statutes' mandatory language leads us to conclude otherwise.

Bancorp's evidence that the FDIC breached its fiduciary duties by failing to apply one of the allegedly milder wind-up methods available, instead of the DITAPA, falls far short of what is required to defeat summary judgment. Bancorp clings principally to the vague and isolated comment of one FDIC official that small banks typically lose twenty-five percent of the value of their assets when liquidating those assets. Bancorp would have the Court infer from that general statement that one of Bancorp's suggested alternative wind-up methods—which may have kept the Bank's business alive either as Golden Pacific or through another bank—would have saved the liquidation costs associated with ending the Bank's business altogether under the DITAPA and would have ultimately preserved more receivership assets for Bancorp's shareholders. Without any additional compelling evidence, that inferential leap is so wide as to amount to sheer speculation.

Bancorp's general observation about liquidations does not even purport to compare the DITAPA method with any other method generally, much less explain how any other method would have been preferential on the facts of this case. For example, Bancorp has not suggested that any other particular bank would have been willing to enter into a P & A and assume the liabilities of the Bank, which at the time was subject to investigation for financial improprieties in connection with the yellow CDs. Bancorp has not offered the comparative costs of either creating a new bank or covering the excess liabilities involved in a P & A, as applied to this case.[7]

---

**6.** The current versions of those statutes contain similarly mandatory language. *See* 12 U.S.C. § 191 (2000) (stating that the OCC's appointed receiver "shall be the Federal Deposit Insurance Corporation if the national bank is an insured bank"); *id.* § 1821(c)(2)(A)(ii) (stating that, when liquidating an insured bank, the FDIC "shall be appointed receiver, and shall accept such appointment"); *id.* § 1821(f) ("payment of the insured deposits ... shall be made by the [FDIC] as soon as possible").

**7.** At the time of the Bank's liquidation, the FDIC was authorized to enter a P & A only if it determined that the "sweetener" it paid to the assuming bank would be less than liquidation costs, or that continuing the Bank's

Moreover, Bancorp does not even allege that the Bank would have been considered a small bank, or that its liquidation incurred losses typical of a small bank liquidation.

Bancorp also directs the Court's attention to judicial opinions and journal articles for the general proposition that P & A arrangements are the preferred method of winding up a failed bank. Again, however, those general observations have no nexus to the facts of this case. None of the policy arguments presented in the sources cited by Bancorp lends any evidentiary support to its position that the DITAPA method is the most expensive one, or that its use by the FDIC could amount to a breach of its fiduciary duties to a failed bank's shareholders. Along similar lines, Bancorp alleges that the FDIC deviated from its customary policy of performing a cost test before choosing a method of winding up a bank. Such an allegation is immaterial in absence of any evidence that the cost test would have led the FDIC to act differently.

In sum, Bancorp's speculation that the FDIC's chosen wind-up method (which is expressly authorized by statute) might have been more expensive than other options is insufficient to defeat summary judgment, especially absent any meaningful evidence or analysis of the facts of this particular liquidation.

## B. *POST–INSOLVENCY INTEREST*

■ Bancorp suggests there are genuine issues of material fact as to whether the FDIC acted properly in awarding itself nine percent post-insolvency interest on

the funds it had previously paid to cover its insurance obligations. In particular, Bancorp alleges that the payments resulted in an unjust enrichment and constituted a breach of fiduciary duty.[8] We disagree.

■ The statutory scheme at the relevant time stated that the FDIC, after paying insured depositors, was "subrogated to *all* the rights of the depositor against the closed bank to the extent of such [insurance] payment." 12 U.S.C. § 1821(g) (1982) (emphasis added). Even more specifically, the FDIC was entitled "to receive the same dividends from the proceeds of the assets of such closed bank ... as would have been payable to the depositor on a claim for the insured deposit." *Id.* Under New York law, a depositor who prevails on a claim against a failed bank is entitled to collect the ordinary and inherent interest on his judgment after all the creditors are paid the principal owed. *See People v. Am. Loan & Trust Co.,* 172 N.Y. 371, 65 N.E. 200, 201 (1902). Moreover, the Supreme Court has long since recognized the general proposition that creditors to a liquidation are entitled to interest, just as any other judgment creditor, even absent specific statutory authorization. *See Nat'l Bank of the Commonwealth v. Mechanics' Nat'l Bank,* 94 U.S. 437, 439, 24 L.Ed. 176 (1876) ("The interest lawfully accruing upon each of the claims was as much a part of it as the original debt."); *see also Stein v. Delano,* 121 F.2d 975, 980–81 (3d Cir.1941) (holding that creditors of insolvent bank are entitled to interest, just as any other judgment

---

operations would be essential to providing adequate banking services in the Bank's community. *See* 12 U.S.C. § 1823(4)(A) (1982).

8. Under New York law, a plaintiff asserting a claim of unjust enrichment must show that the defendant was enriched at the plaintiff's

expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant. *See, e.g., Lake Minnewaska Mountain Houses, Inc. v. Rekis,* 259 A.D.2d 797, 686 N.Y.S.2d 186, 188 (3rd Dept. 1999).

creditor).[9] It follows that the FDIC, as the depositors' subrogee, is entitled to post-insolvency interest. The only two cases we have found directly addressing the issue agree. *See FDIC v. Citizens State Bank of Niangua*, 130 F.2d 102 (8th Cir.1942); *FDIC v. Iowa Growthland Financial Corp. (In re Receivership of First Nat'l Bank in Humboldt)*, 523 N.W.2d 591 (Iowa 1994).

Furthermore, we note that to hold otherwise would give Bancorp the windfall of essentially an interest-free loan, and leave the FDIC with no compensation for the loss of the use of the funds it advanced. *See Citizens State Bank*, 130 F.2d at 104 n. 6 ("Neither the purpose of the Act nor its legislative history evidences any philanthropic intent, in a situation such as this, to allow the use of the [FDIC's] funds to become a source of profit to stockholders of a defaulting bank, at the expense of the [FDIC]."); *Humboldt*, 523 N.W.2d at 594–95 (stating that the fiscal integrity of the FDIC's insurance should not be compromised for the benefit of a failed bank's investors); *see also Corbin v. Fed. Reserve Bank of New York*, 475 F.Supp. 1060, 1069 (S.D.N.Y.1979) ("FDIC is not obligated even if named as Receiver to apply its trust fund for the benefit of the interests of subordinate debenture and stock holders of insolvent banks or to furnish subsi-

dies for them."), *aff'd*, 629 F.2d 233 (2d Cir.1980).

■ We also agree with the District Court that the amount of the FDIC's interest payment was proper. The FDIC charged interest at a rate of nine percent, under the theory that an ordinary judgment in New York state court would earn as much. *See* N.Y. C.P.L.R § 5004 (McKinney 1963). We need not decide whether the 9% rate would result in unjust enrichment or amount to a breach of fiduciary duty because, as the District Court correctly noted, the FDIC received only a partial payment and thus effectively earned only 4.3% in interest.[10]

Bancorp argues that even a 4.3% rate is excessive because, under New York law at the relevant time, the maximum legal interest rate for bank liquidations was only 4%. *See* N.Y. Banking Law § 627 (McKinney 1971). Even assuming Bancorp's contention were true,[11] Bancorp's potential recovery would amount to only the difference between a rate of 4.3% and a rate of 4%. For reasons discussed in the following section, that claim would not be large enough to confer standing upon Bancorp because the outstanding tax claim, owed to the IRS, would offset any potential recovery by Bancorp.[12]

---

9. We note, however, that interest cannot be paid to any depositor or creditor, including secured creditors, unless the receivership first satisfies its principal obligations to all creditors. *See Ticonic Nat'l Bank v. Sprague*, 303 U.S. 406, 410–413, 58 S.Ct. 612, 82 L.Ed. 926 (1938); *accord Citizens State Bank of Lometa v. FDIC*, 946 F.2d 408, 416–17 (5th Cir.1991) ("The courts have consistently denied post-insolvency interest, as such an award would violate the rules of 'ratable' distribution. [An] exception[ ] to this rule [is] where the assets of the receivership are sufficient to pay all provable claims in full . . . .").

10. We note that Congress has since addressed the issue of the proper rate of post-insolvency

interest by granting the FDIC rule-making authority on the question. *See* 12 U.S.C. § 1821(d)(10)(C) (2000); *see also* 12 C.F.R. § 360.7 (2003) (establishing a uniform federal rate of post-insolvency interest).

11. Arguably the four percent rate applies only to claims presented to New York State's Superintendent of Banks and processed through the state's regulatory machinery. *See* N.Y. Banking Law § 627 (McKinney 1971).

12. Had the FDIC collected only 4% in interest, instead of 4.3%, the receivership estate would have approximately an additional $800,000, which, even if added to Bancorp's

■ Bancorp makes two further arguments: that the FDIC was not entitled to charge the receivership interest because it did not normally do so; and that the FDIC's choice of the higher interest rate was improper because it was done with the express intention of depleting all of the estate's assets.[13] Bancorp has adduced evidence that it was not the practice of the FDIC at the relevant time to charge postinsolvency interest against the estate. Hovan Dep. at 192–95 ("It was the FDIC policy not to pay interest after the date of closing. There were exceptions to that policy, but I think all of the exceptions were directed by the court. I don't think the FDIC took it upon itself to pay interest after closing unless so ordered by a court."). But internal agency practices do not create legal rights in third parties. *See Clarry v. United States*, 85 F.3d 1041, 1048 (2d Cir.1996) (quoting *White v. Shalala*, 7 F.3d 296, 303 (2d Cir.1993)).

■ As for the second contention, while the FDIC employees apparently agreed, in an e-mail, to assess interest against the receivership estate at 9% instead of 4% because if they used the latter figure "there would be excess funds to pay the stockholders," they explained that "[t]his would restrict the FDIC from making the required statement of final disposition to the IRS and would percipitate [sic] the additional claim from the IRS." Herbert Decl., exh. 22. Bancorp conceded before the District Court that "[t]he FDIC ... charged the interest to eliminate any possible surplus that might exist *that could enure to the benefit of the IRS*." Pl.'s Statement of Disputed Material Facts in Opp. to Def.'s Mot. for Summ. J. ¶ 39

(emphasis added). Because Bancorp thus acknowledged that none of the funds in question could have, under any scenario, been returned to it, no claim for unjust enrichment can lie.

## C. *WASTE CLAIMS*

■ Bancorp seeks approximately $8 million in claims of corporate waste (aside from its claims regarding the FDIC's interest). However, Bancorp does not dispute that the receivership estate has senior outstanding credit obligations, including a tax liability of approximately $11.7 million. Thus, even if Bancorp's waste claims were meritorious, it would recover nothing. These facts deprive Bancorp of standing. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (discussing standing requirements of "injury in fact," causation, and redressability).

Our conclusion is supported by precedent in at least one other Circuit. In *Herring v. FDIC*, the Ninth Circuit determined that the plaintiffs, shareholders of a failed bank, lacked standing to bring their fraud claims against the FDIC, as receiver of the bank, because the FDIC and other creditors had larger, senior claims outstanding against the receivership estate. 82 F.3d 282, 285 (9th Cir.1995) ("The shareholders could not recover funds even if their fraud allegations were true; the shareholders thus lack standing to challenge that fraud."). We agree with the reasoning of *Herring*, which Bancorp does not challenge. Bancorp's only response is to highlight the irony that the IRS's tax deficiency is allegedly premised on the

---

$8 million in waste claims, would not surpass the outstanding tax liability of over $11 million.

13. The FDIC's assertion, *see* Appellee's Br. at 37, that these arguments were not raised before the District Court is without merit. *See* Pl.'s Statement of Disputed Material Facts in Opp. to Def's Mot. for Summ. J. ¶¶ 38–39.

**206**

Bank's solvency in 1985—a central theme to Bancorp's other claims. We cannot discern any legal argument from that observation and thus conclude that the District Court did not err in granting the FDIC summary judgment on Bancorp's waste claims.[14]

### IV. CONCLUSION

For the stated reasons, the judgment of the District Court is AFFIRMED.

---

14. Because the District Court properly granted summary judgment to the FDIC on all claims, Bancorp's jury demand is rendered moot. *See Sweat v. Peabody Coal Co.,* 94 F.3d 301, 306 (7th Cir.1996).