129 F.3d 120
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Richard WAGNER, Plaintiff,
v.
CATERPILLAR INC., Defendant.
 No. 97-1475.
 United States Court of Appeals, Seventh Circuit.
 Submitted Sept. 4, 1997.[1]
Decided Sept. 30, 1997.
 
 1
 Before CUDAHY, FLAUM and WOOD, Circuit Judges
 
 ORDER
 
 2
 We affirm the district court decision and adopt the district court's memorandum opinion and order dated January 29, 1997.
 
 
 3
 AFFIRMED.
 
 MEMORANDUM OPINION AND ORDER
 
 4
 Plaintiff Richard Wagner filed this action against his former employer, Defendant Caterpillar Inc. ("Caterpillar"), alleging that Caterpillar discriminated against him on the basis of his back condition in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., and discharged him in retaliation for exercising his rights under the Illinois Workers Compensation Act. Wagner's two-count Complaint, as amended on November 16, 1995, charges Caterpillar with firing him because of a back injury (Count I), and in retaliation for seeking related workers' compensation benefits (Count H). The case was referred to this court on January 19, 1996 and, on May 23, 1996, both parties consented to proceed before a U.S. Magistrate Judge in accordance with 28 U.S.C. § 636(c).
 
 
 5
 The court has jurisdiction over the first count of the complaint pursuant to 28 U.S.C. § 1331 because the claim arises under federal law. The court has supplemental jurisdiction over the state law retaliatory discharge claim pursuant to 28 U.S.C. § 1367. Venue properly lies in this district under 28 U.S.C. § 1391(b) and (c). On June 12, 1996, Defendant filed motion for summary judgment, arguing that the decision to discharge was actually based on Plaintiff's dishonesty. Specifically, Caterpillar argues, company managers discharged Wagner because they concluded, after viewing a surveillance videotape, that Wagner had lied about his physical condition. Having reviewed the relevant facts, evidentiary materials, and case law, the court concludes that summary judgment is proper and grants Defendant's motion.
 
 FACTUAL BACKGROUND[1]
 
 6
 In September 1968, Caterpillar hired Richard Wagner ("Wagner") to work at its Kendall County Facility, known as the Aurora Plant. (Defendant's Statement of Undisputed Facts (hereinafter "Def.'s 12(M) Statement") p 6.) Wagner initially worked as a diverter, but he later obtained a position as a welder after successfully completing Caterpillar's training program. (Wagner Dep., at 12.) Wagner held this position from 1969 until September 1987 when he suffered a job-related back injury. (Def.'s 12(M) Statement p 6, 7.) Due to attendant complications, Wagner was unable to continue working as a welder. (Id. p 7.) Caterpillar attempted to find him a position that complied with his medical restrictions; in fact, Wagner admits that each time he complained that a job was beyond his capabilities, Caterpillar responded to his concerns. (Id. p 8, 14.) He further acknowledges that Caterpillar's medical department always honored his medical restrictions. (Id. p 14.)
 
 Plaintiff's 1987 Injury and Accommodations
 
 7
 From the time he ceased working as a welder in September 1987 until April 1993, Wagner worked sporadically in various jobs at the Aurora plant. (Def.'s 12(M) Statement p 8; Wagner Dep., at 14-22.) He was limited by numerous medical restrictions, including: a requirement that he be allowed to leave his job to walk around for one to two minutes every half hour; a requirement, that he be allowed to sit for five to ten minutes every half hour; and a prohibition on prolonged bending at the waist, lifting more than 30 pounds, lifting more than 20 pounds while bending, heavy pushing and pulling, and repetitive bending or twisting at the waist. (Def.'s 12(M) Statement p 18.) Wagner believes these restrictions continue today. (Id.)
 
 
 8
 After his 1987 injury, Wagner was first assigned to weld agricultural tractor frames. He performed that job only for four partial days, however, due to complications with his back. (Def.'s 12(M) Statement p 9.) At that point, Wagner visited Caterpillar's company physician, Dr. Matthew T. Neu, and advised him of his back problems. (Id.) After inspecting the job, Dr. Neu agreed to return Wagner to medical leave, and he modified Wagner's medical work restrictions to include a requirement that Wagner operate a buffer-grinder only if the full weight of the grinder would be supported by the surface being ground. (Id. p 9, 18.) Dr. Neu believed that Wagner's physical condition rendered him unable to continue working as a welder. (Wagner Dep., at 16.) To this day, Wagner himself believes that he is unable to perform any welding jobs. (Def.'s 12(M) Statement p 15.)
 
 
 9
 After some time on medical leave, Wagner returned to an office job at the Aurora plant performing mostly filing work. (Id. p 10.) Because this was only a temporary position, three or four months later Wagner was assigned to work at a computer terminal. (Id.) When he learned of this assignment, Wagner voiced his objection to his supervisor, contending that the job would exceed his medical restrictions. (Id.) Wagner's supervisor sent him to Dr. Neu, who reviewed Wagner's restrictions and agreed that he needed to be reassigned. (Id.; Wagner Dep., at 19.) Wagner was then placed in the "REP" (light duty) area cleaning parts with a shot blaster. (Def.'s 12(M) Statement p 11.) This job lasted for approximately two or three months until Wagner honored his union's strike at the Aurora facility. (Id.)
 
 
 10
 After the strike ended, Wagner was recalled in August 1992 to a new position in the REP area, described as "subbing components to hydraulic cylinders." (Id.p 12.) As with the previous assignments, Wagner had difficulty adjusting to his new job. At one point during the course of his work, Wagner advised his supervisor, Richard Mulvaney, that the job he was performing was beyond his medical restrictions. (Id. p 34.) Mulvaney responded that Wagner had to either "do the job or [he] was out of there." (Id.) Wagner never asked Mulvaney what he meant by this comment (Id.), nor is there any indication in the record that Mulvaney explained his statement to Wagner.
 
 
 11
 Wagner claims that Mulvaney made another critical comment when Wagner explained that the REP area workers could not meet the production rates required of regular duty workers. (Plaintiff's Response to Defendant's Statement of Undisputed Material facts (hereinafter "Pl.'s 12(M) Response") p 34.) Specifically, Mulvaney responded that the line "had to be covered and if they couldn't do it, he'd find some way to do it." (Id.) The record does not reveal whether Wagner requested, or Mulvaney offered, any explanation for this statement.
 
 
 12
 After performing the "subbing components" job for three or four days, Wagner stopped working again due to pain in his back. (Def.'s 12(M) Statement p 12.) Wagner claims that on August 21, 1992, in accordance with a Caterpillar policy requesting employees to report any work-related injury to their supervisor, he advised Mulvaney that he hurt his back while picking up some parts. (Plaintiff's Statement of Additional Undisputed Material Facts (hereinafter "Pl.'s 12(N) Statement") p 1, 2.) Defendant challenges Wagner's assertion that he suffered a separate injury at this time, observing that Wagner's own testimony indicates merely that his back was bothering him, that he was experiencing pain and discomfort, and that he informed Mulvaney that the work was beyond his restrictions. (Defendant's Response to Plaintiff's Rule 12(N)(3)(b) Statement of Additional Facts Purportedly Requiring the Denial of Summary Judgment (hereinafter "Def.'s 12(N) Response") p 1.)
 
 
 13
 At the time he informed Mulvaney of his back pain, Wagner requested leave to cease working and proceed to Caterpillar's medical department. He claims that Mulvaney denied him permission to leave the job and, instead, told him "[y]ou will finish what you are doing before you go to medical." (Def.'s 12(M) Statement p 35.) At the end of his shift, Wagner did report to Dr. Neu that his back was "bothering" him. (Id. 44 12, 35.) Dr. Neu reviewed the job, determined that the position was beyond Wagner's medical restrictions, and again placed Wagner on medical leave. (Def.'s 12(M) Statement pp 12, 35; Wagner Dep., at 21.) For the next eight months, Wagner remained on medical leave, and Caterpillar continued to pay his salary and reimburse his medical expenses. (Def.'s 12(M) Statement p 35.)
 
 
 14
 Caterpillar recalled Wagner to work in April 1993, offering him a light assembly job in the REP area. (Id. p 13.) After about three weeks, Wagner complained to Dr. Neu that the sitting was bothering him, prompting Dr. Neu to arrange an appointment with an outside orthopedic surgeon, Dr. Mark Lorenz. (Id.) Dr. Lorenz scheduled Wagner for surgery and recommended that Wagner return to medical leave status pending the operation. (Id.)
 
 Plaintiff's Roofing Activities
 
 15
 Wagner was still on medical leave in June 1993 when Dale Carhill, a human resources official at the Aurora plant, received an anonymous tip that Wagner was "roofing his house." (Id. p 19; Carhill Dep., 16.) Prior to this tip, Carhill had been suspicious of Wagner's medical condition because he had observed Wagner walking with an apparently inconsistent limp. (Def.'s 12(M) Statement p 19.) On one occasion, Carhill followed Wagner outside to observe his walk and noticed that Wagner's limp seemed to disappear once he entered Caterpillar's parking lot. (Pl.'s 12(N) Statement p 21; Carhill Dep., at 51.) After receiving the anonymous tip, Carhill drove by Wagner's house and noticed scaffolding and roofing materials. (Carhill Dep., at 15-16.) Based on the tip and his own preexisting suspicions, Carhill contacted R.J. McGough and Associates ("McGough"), a surveillance firm, to videotape Wagner. (Def.'s 12(M) Statement p 19; Pl.'s 12(N) Statement p 15.) Placing employees under surveillance fell within Carhill's administrative duties and was a procedure commonly used to determine whether a Caterpillar employee was exaggerating his or her medical condition. (Carhill Dep., at 10-12; Peterson Dep., at 26-29.) Carhill provided McGough with all the necessary information for Wagner's surveillance, and gave the date of Wagner's injury as 1987. (Pl.'s 12(N) Statement p 15, 16.)
 
 
 16
 On June 9, 1993, Carhill received the first of the surveillance videotapes. (Carhill Dep., at 25.) The tape showed a man Carhill believed to be Wagner performing activities Carhill suspected were inconsistent with Wager's restrictions and on-the-job complaints.[2] The following day, Carhill brought the videotape to the attention of Dr. Neu who agreed with Carhill's conclusion.[3] (Id. at 52; Def.'s 12(M) Statement p 20.) In fact, Dr. Neu had examined Wagner earlier that day and found Wagner's subjective complaints during the appointment completely inconsistent with the activities he performed on the videotape. (Def.'s 12(M) Statement p 20.)
 
 
 17
 Wagner admits that, at the time of his surveillance, he was assisting a contractor on a re-roofing project at his house. (Id. p 26.) Over the course of several days, Wagner engaged in various activities, including driving in nails with an air nailer and carrying tools to and from the roof via a ladder. (Id.) Furthermore, Timothy Tunt, Caterpillar's Building B Superintendent and Mulvaney's immediate supervisor, and Mulvaney both observed that the videotape revealed Wagner climbing ladders, helping move sheets of plywood into place, and lifting a trailer off its hitch. (Mulvaney Dec. p 6, Ex. 6 to Defendant's Motion for Summary Judgment (hereinafter "Def.'s Motion"); Tunt Dec. p 6, Ex. 5 to Def.'s Motion.) Wagner himself testified that during the course of this work, he knew that he was being videotaped by someone he believed was working for Caterpillar. (Def.'s 12(M) Statement p 26.)
 
 
 18
 Wagner contends that his videotaped activities were not inconsistent with his medical restrictions because none of the roofing work he performed in June 1993 involved lifting more than 30 pounds. (Pl.'s 12(N) Statement p 6.) In support of this claim, Wagner offers the affidavits of Lars Bauer and Garrett Lampe, two of the individuals who assisted Wagner with the re-roofing project. According to both men, most of Wagner's work was supervisory in nature and, moreover, the air gun Wagner used weighed less than ten pounds. (Id.p 6, 14.) Bauer and Lampe also stated that they, not Wagner, lifted and supported the weight of the plywood sheets as they were positioned on the roof. (Id. p 14.) Neither Bauer nor Lampe make any reference to the other activities Tunt and Mulvaney purportedly observed Wagner performing on the videotape.
 
 Plaintiff's Termination
 
 19
 On or about June 11, 1993, Carhill met with Tunt, Mulvaney, and Personnel Services Manager David Peterson to discuss the surveillance video and Wagner's employment situation. (Mulvaney Dec. p 3, Ex. 6 to Def.'s Motion; Tunt Dec. p 3, Ex. 5 to Def.'s Motion; Peterson Dep., at 12-13; Carhill Dep., at 37-39; Pl.'s 12(N) Statement 1 17, 27; Def.'s 12(M) Statement p 21.) Carhill showed the videotape to those present and, after some discussion, all four individuals concluded that Wagner's employment should be terminated. (Def.'s 12(M) Statement p 21; Pl.'s 12(N) Statement p 19.)
 
 
 20
 Tunt and Mulvaney made the actual decision to dismiss Wagner based on their belief that he had lied about his true medical condition. (Def.'s 12(M) Statement p 21.) Specifically, Tunt and Mulvaney believed the videotape belied Wagner's claims as to his physical abilities and limitations.[4] (Id. p 22.) In reaching their decision, Tunt and Mulvaney considered the surveillance tape, Wagner's medical restrictions, and Dr. Neu's report expressing his conclusion that Wagner was lying about his physical capabilities.[5] (Pl.'s 12(N) Statement p 29; Carhill Dep., at 37-39; Mulvaney Dec. p 6, Ex. 6 to Def.'s Motion; Tunt Dec. p 6, Ex. 5 to Def.'s Motion.)
 
 
 21
 Peterson advised Wagner of his termination by a certified letter dated June 11, 1993. (Def.'s 12(M) Statement p 23.) Wagner had been on uninterrupted medical leave since April 1993 because his doctor had determined that he was unable to return to work at Caterpillar due to medical restrictions resulting from his 1987 back injury.[6] (Id. p 15, 17; Defendant's Answers to Interrogatories, No. 9.) The letter stated in pertinent part that Wagner was being "separated from employment with Caterpillar Inc. effective June 11, 1993 for dishonesty (not accurately representing your true medical condition)." (Def.'s 12(M) Statement p 23.) Prior to his discharge, Wagner received no explanation for his termination or an opportunity to discuss the circumstances surrounding the surveillance videotape. (Pl.'s 12(N) Statement p 23.) When asked at his deposition why he believed he was terminated, Wagner stated that since "[the reason for the discharge] was never explained to me, I really have no idea" other than "I guess over wanting the surgery done." (Def.'s 12(M) Statement p 31.) In support of this contention, Wagner notes that his discharge occurred less than two weeks before the scheduled surgery. (Id.)
 
 
 22
 Wagner also believes that he was fired for filing workers' compensation claims because he "can see no other reason why [he] was fired." (Id. p 38, 39.) Although he had no claim pending on June 11, 1993, Wagner testified that he had arranged to meet with an attorney on that date to discuss the possibility of filing a workers' compensation claim against Caterpillar in connection with an August 1992 injury.[7] (P.'s 12(N) Statement p 31.) He waited nearly a year before considering filing that claim, Wagner explains, because he had not experienced much pain or discomfort in his back until he returned to work in April 1993. (Id. p 33.)
 
 
 23
 Wagner has not sought work since leaving Caterpillar because he does not believe he is capable of performing any meaningful labor. (Id. p 16.) When asked if he is completely disabled from any work, Wagner replied, "I wouldn't say any work, but I think I'm very limited." (Wagner Dep., at 63.)
 
 
 24
 Although Wagner had been scheduled for surgery on June 21, 1993, Dr. Lorenz canceled the procedure after viewing the surveillance video.[8] (Def.'s 12(M) Statement p 24.) According to Plaintiff, Dr. Lorenz believed Plaintiff would be charged with fraud and "did not want to get involved in it." (Wagner Dep., at 58.) Both parties agree that Dr. Lorenz believed that the videotape showed Wagner performing activities inconsistent with his claimed disability. (Def.'s 12(M) Statement p 24.) Indeed, Wagner conceded that Dr. Lorenz "basically called him a liar." (Wagner Dep., at 60.) Wagner ultimately had Dr. James Dupress perform his back surgery on June 30, 1994. (Pl.'s 12(N) Statement p 34.)
 
 Plaintiff's Workers' Compensation Claims
 
 25
 Wagner has filed three workers' compensation claims against Caterpillar. (Def's 12(N) Statement p 27.) The first occurred in January 1973 and involved a foot injury he sustained in December 1971. (Id. p 28.) The parties settled that claim out of court. (Id.) In December 1987, Wagner filed a second workers' compensation claim as a result of the back injury he sustained in September 1987. (Id. p 29.) This claim was settled in June 1991. (Id. p 30.) Wagner filed his third workers' compensation claim after his June 1993 termination. (Id.)
 
 
 26
 It is undisputed that Wagner was never disciplined for filing his first two workers' compensation claims; indeed, there is no evidence that anyone from Caterpillar ever said anything to Wagner about these claims. (Id. 40; Wagner Dep., at 66-67.) Caterpillar consistently allowed Wagner to take paid leaves of absence to recover from his injuries, and it reimbursed his medical expenses. (Def.'s 12(M) Statement p 40.) After his second claim settled in June 1991, Wagner received no workers' compensation benefits through the date of his discharge. (Id. p 41.) Indeed, from June 1991 until his separation in June 1993, Wagner received only weekly disability benefits and/or long term disability benefits. (Id.)
 
 
 27
 The parties disagree as to whether representatives of Caterpillar were aware of Wagner's 1992 injury or his intention to file a workers' compensation claim in connection with that injury. Plaintiff contends that Tunt, Mulvaney, Carhill, and Peterson knew that Wagner had suffered a work-related back injury in August 1992 and/or thereafter intended to pursue workers' compensation benefits. (Pl.'s 12(M) Response p 30.) In support of this contention, Plaintiff relies on his own affidavit and deposition testimony, as well as factual assertions made in his 12(N) Statement. For example, in his affidavit, Wagner claims that on or about August 21, 1992, he advised Mulvaney that he had hurt his back while working in the light duty area. (Wagner Aff. p 1.) Wagner's deposition testimony, however, indicates that he did not specifically mention an injury but, rather, stated that he experienced pain and discomfort in his back while performing the subbing assignment which prompted him to "[go] to my supervisor." (Wagner Dep., at 50-51.)
 
 
 28
 Wagner also relies on statements made by Dr. Lorenz and a nurse employed at Caterpillar to support his theory that Caterpillar personnel knew of his intent to file a workers' compensation claim in connection with a 1992 back injury. According to Wagner, Dr. Lorenz warned him that he Was going to be sued for workers' compensation fraud. (Pl.'s 12(M) Response p 24.) In addition, Wagner claims that in April 1993, he overheard a nurse informing other staff at the Aurora MRI Center (where Wagner was having an MRI performed) that "this was a workers' compensation matter." (Wagner Aff. p 6.) Wagner further points to a billing statement he received from the Aurora MRI Center, dated May 29, 1993, which states in relevant part that "[the Aurora MRI Center has] filed a workers' compensation claim with [Wagner's] employer."[9] (Id. p 7; Pl.'s 12(M) Response p 7.)
 
 
 29
 Defendant claims, conversely, that at the time of Wagner's termination, Tunt, Mulvaney, Carhill, and Peterson lacked any knowledge of Wagner's allegedly new injury or his intention to file the third workers' compensation claim. (Def.'s 12(M) Statement p 30.) Tunt and Mulvaney stated in their declarations that when they decided to dismiss Wagner, they knew neither that Wagner had sustained a work-related injury after 1987, nor that he intended to file a workers' compensation claim in June of 1993. (Tunt Dec. p 7, Ex. 5 to Def.'s Motion; Mulvaney Dec. p 7, Ex. 6 to Def.'s Motion.) In addition, Carhill testified that when he ordered Wagner's surveillance in June 1993, he was not aware that Wagner had injured (or claimed to have injured) his back in August 1992. (Carhill Dep., at 20.) Finally, Peterson testified that he could not recall whether he knew, at the time the decision to terminate Wagner was made, that Wagner had re-injured his back in August 1992. (Peterson Dep., at 20-21.) Carhill and Peterson testified that they did not recall having any knowledge of Wagner's intent to file a third workers' compensation claim. (Carhill Dep., at 21-22; Peterson Dep., at 22.)
 
 
 30
 Wagner filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 28, 1994. In his charge, Wagner alleged that he was discriminated against "because of [his] physical handicap/disability, orthopedic impairment (back)," and that he was fired "to protect [Caterpillar] from any future liability" for workers' compensation benefits. (Charge of Discrimination, Ex. to Complaint.) The EEOC issued a right to sue letter on July 17, 1995.
 
 DISCUSSION
 
 31
 Summary judgment is appropriate where the court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In considering such a motion, the court accepts as true the facts set forth by the non-movant, and draws all justifiable inferences in that party's favor. Wade v. Byles, 83 F.3d 902, 904 (7th Cir.1996). A party opposing summary judgment may not rest solely upon the pleadings, however, but must set forth specific allegations to demonstrate the existence of a genuine issue for trial. Id. at 904 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986)). This must amount to more than "some metaphysical doubt." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Mills v. First Fed. Sav. & Loan Ass'n, 83 F.3d 833, 840 (7th Cir.1996).
 
 
 32
 In employment discrimination cases, the standards for summary judgment are applied with added rigor in light of crucial intent and credibility issues. DeLuca v. Winer Indus., Inc., 53 F.3d 793, 797 (7th Cir.1995) (quoting Robinson v. PPG Indus., Inc., 23 F.3d 1159, 1162 (7th Cir.1994)). Nevertheless, even where issues of motive and intent are involved, summary judgment may be appropriate if the plaintiff fails to present evidence demonstrating the alleged motive or intent to discriminate. Cliff v. Board of School Comm'rs, 42 F.3d 403, 409 (7th Cir.1994).
 
 A. Plaintiff's ADA Claim
 
 33
 Plaintiff alleges that Caterpillar discriminated against him on the basis of his back condition in violation of the ADA when it terminated his employment on June 11, 1993. Generally, Title I of the ADA protects qualified disabled employees from the discriminatory conduct of their employers. 42 U.S.C. § 12112(a) (1990). The statute provides in relevant part that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to [the] ... discharge of employees."[10] Id. Evidence of discrimination may be either direct or circumstantial. DeLuca, 53 F.3d at 797.
 
 
 34
 Plaintiff here has offered no direct evidence of discrimination, so the court addresses only the indirect, burden-shifting proof paradigm. In order to prove his claim under the indirect analysis, a plaintiff must demonstrate that (1) he is a member of a protected class-in this case, "a qualified individual with a disability"; (2) his work performance met the employer's legitimate job expectations; and (3) he was terminated. DeLuca, 53 F.3d at 797. If the plaintiff makes this prima facie showing, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the termination. Sirvidas v. Commonwealth Edison Co., 60 F.3d 375, 377 (7th Cir.1995). Once the employer makes this proffer, the burden shifts back to the plaintiff to prove that the explanation is pretextual and not the true reason for the discharge. Id. at 378.
 
 
 35
 The parties disagree on only two issues relevant to this dispute: Plaintiff's membership in a protected class, and the truth of Defendant's proffered explanation for the discharge. The court discusses each argument below.
 
 
 36
 1. Plaintiff's Status as a Qualified Individual with a Disability
 
 
 37
 Initially, the parties dispute Plaintiff's ability to make a prima facie showing that he is a member of the class protected under the ADA. The statute only applies to "qualified individuals with a disability," defined in pertinent part as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); Gile v. United Airlines, Inc., 95 F.3d 492, 496 (7th Cir.1996). Defendant contends that Plaintiff could not perform the essential functions of his position at the time of his discharge. (Defendant's Memorandum in Support of its Motion for Summary Judgment (hereinafter "Def.'s Memo"), at 8.) Indeed, Defendant asserts, Wagner testified that even he does not believe himself capable of performing any meaningful labor. (Pl.'s 12(N) Statement p 16.)
 
 
 38
 Plaintiff seems to agree. Although he does urge that Defendant should have offered him a position if he was truly capable of working (Plaintiff's Memorandum in Support of his Opposition to Motion for Summary Judgment (hereinafter "Pl.'s Opposition Memo"), at 7), Plaintiff does not identify any job he was capable of performing. When asked if he was completely unable to do any work, Wagner replied, "I wouldn't say any work, but I think I'm very limited." (Wagner Dep., at 63.) Moreover, in light of Wagner's repeated unsuccessful efforts to return to work, the record arguably supports a conclusion that he is not a "qualified individual." Here, however, Defendant is in the awkward position of arguing that Plaintiff's own testimony established that his disabilities are severe, while simultaneously urging that Plaintiff exaggerated his physical disabilities. For purposes of this decision, the court may, assume that Plaintiff was a "qualified individual" because his case falters on another point.
 
 2. Pretext
 
 39
 Assuming Plaintiff has met his prima facie burden of proof, Defendant must offer a legitimate reason for discharging him. In this case, Defendant claims that it terminated Plaintiff because of his dishonesty, not his back injury. The validity of this explanation finds ample support in the record. For example, the meeting to discuss the possibility of terminating Wagner was initiated only after Carhill obtained the surveillance videotape showing Wagner performing a number of activities on and around the roof of his house. (Pl.'s 12(N) Statement p 17, 27.) At this time, Caterpillar understood Wagner to be on uninterrupted medical leave pending back surgery and, thus, unable to work due to physical limitations. (Def.'s 12(M) Statement p 19.) Wagner, in fact, concedes that he was working on the roof of his house the day he observed someone from Caterpillar videotaping him, and Dr. Neu opined that the taped activities were completely at odds with Wagner's subjective complaints. (Id. p 26; Pl.'s 12(N) Statement p 29.) Furthermore, Tunt and Mulvaney, the individuals responsible for Wagner's discharge, fired Wagner only after concluding that he was misrepresenting his true medical condition in light of the videotape, Wagner's medical restrictions, and Dr. Neu's opinion. (Pl.'s 12(N) Statement p 29.)
 
 
 40
 Because Defendant's explanation for the discharge is non-discriminatory, Plaintiff must demonstrate that the reason is pretextual; that is, "a lie, specifically a phony reason for some action." Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir.1995). A plaintiff may establish pretext either with direct evidence that the employer was likely motivated by a discriminatory reason, or with indirect evidence that the employer's explanation lacks credibility. DeLuca, 53 F.3d at 797 (citing Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1039 (7th Cir.1993)). The onus is on Wagner to go beyond his pleadings and present evidence from which a rational fact finder could infer that Caterpillar lied about its proffered reason for the discharge. Weisbrot v. Medical College of Wis., 79 F.3d 677, 682 (7th Cir.1996); DeLuca, 53 F.3d at 797.
 
 
 41
 Plaintiff contends that several discriminatory statements made by Mulvaney, as well as the incredibility of Defendant's claimed belief that Wagner was exaggerating his injury, demonstrate that Caterpillar's explanation is merely a pretext for its illegitimate motive. The court discusses each argument below.
 
 
 42
 a. Mulvaney's Statements
 
 
 43
 Plaintiff cites several statements made by Mulvaney in August 1992 as evidence of Defendant's discriminatory motive.[11] The first comment occurred while Wagner was subbing parts in Caterpillar's light-duty area. When Wagner informed Mulvaney that he thought the work was beyond his medical restrictions, Mulvaney replied that Wagner must either "do the job or [he] was out of there." (Def.'s 12(M) Statement p 34; Pl.'s Opposition Memo, at 4.) Given the fact that Mulvaney never explained his comment to Wagner, this statement is, at best, ambiguous. As Defendant points out, one plausible explanation is that Wagner would have been relocated to another position if he refused to continue working. Indeed, less than one week into that assignment, Caterpillar's physician excused Wagner from his subbing duties. (Def.'s 12(M) Statement p 12, 35.) Because the evidence must be viewed in a light most favorable to the non-moving party, however, the court accepts Wagner's assertion that Mulvaney meant that he would fire Wagner if he could not perform the work. (Pl.'s Opposition Memo, at 4.) See Russell, 51 F.3d at 69 ("interpretative ambiguities must be resolved in favor of the nonmoving party").
 
 
 44
 Even if Mulvaney's remark reflected some personal animus, Defendant argues, Plaintiff has failed to establish a nexus between the comment and Caterpillar's employment decision. (Def.'s Memo, at 11.) See Hong v. Children's Mem'l Hosp., 993 F.2d 1257, 1266 (7th Cir.1993) (requiring a link between the allegedly discriminatory comment and the employment decision in question). That is, Wagner has presented no evidence suggesting that the decision to fire him resulted from Mulvaney's negative attitude towards him. Defendant notes, for example, that the decision to terminate Wagner occurred more than nine months after Mulvaney's remark. (Defendant's Reply Memorandum in Support of its Motion for Summary Judgment (hereinafter "Def.'s Reply Memo"), at 7.) Wagner remained an employee of Caterpillar during this time period; indeed, the company recalled him to work in April 1993 following an eight month medical leave. (Def.'s 12(M) Statement p 13.)
 
 
 45
 The notion that the motivation for Caterpillar's decision, made immediately after viewing the videotape, was in fact revealed by a comment made nine months earlier, is simply implausible. See Knox v. First Nat'l Bank of Chicago, 909 F.Supp. 569, 574 (N.D.Ill.1995) (a relevant inquiry in determining pretext is whether "the statement or remark of the decision maker [is] so remote in time ... that its probative value is de minimis "). The court finds the timing of Mulvaney's comment too remote in relation to Caterpillar's employment decision to support a finding that Caterpillar's reason was pretextual.
 
 
 46
 As further evidence of pretext, Wagner offers a second statement made by Mulvaney in August 1992, also while Wagner was subbing parts in the REP area. In response to Wagner's request to see the company's medical personnel, Mulvaney stated that Wagner must first "finish what you are doing." (Pl.'s Opposition Memo, at 4.) The court finds this statement unambiguous and subject to only one conceivable explanation: Wagner had to complete his job before he could go to Caterpillar's medical department. Indeed, at the end of the shift, Mulvaney did permit Wagner to go to medical. (Def.'s 12(M) Statement p 12, 35.) His conduct does not support a finding of discriminatory animus.
 
 
 47
 Finally, Plaintiff claims in his affidavit that when he told Mulvaney that the light-duty workers could not achieve the standard duty rates, Mulvaney responded that the line "had to be covered and if they couldn't do it, he'd find some way to do it."[12] (Pl.'s 12(M) Response p 34.) Plaintiff apparently believes that this statement demonstrates Mulvaney's generally negative attitude towards him and the other light-duty employees. Again, however, even assuming that Mulvaney's comment expressed his personal animus towards Wagner in particular or persons with disabilities in general--rather than Mulvaney's determination to get the work done--Plaintiff cannot establish a causal connection between his sentiments and the decision to terminate Wagner's employment. See Fuka v. Thomson Consumer Elecs., 82 F.3d 1397, 1403 (7th Cir.1996) (where no nexus is shown between the remark and the employment decision in question, the remark alone "will not give rise to an inference of discrimination even when uttered by the ultimate decisionmaker"). Nor was Mulvaney the sole decision-maker here. To the contrary, Mulvaney was but one of four individuals who participated in the termination discussions, and both he and Tunt jointly agreed to dismiss Wagner. (Def.'s Reply Memo, at 7-8; Pl.'s 12(N) Statement p 19.) Plaintiff has presented no evidence suggesting that Tunt was motivated by a discriminatory intent, or that he was influenced by Mulvaney's alleged animus. Thus, Mulvaney's statements cannot establish pretext sufficient to overcome the summary judgment motion.
 
 
 48
 b. The Credibility of Defendant's Beliefs
 
 
 49
 In an attempt to establish pretext without relying on Mulvaney's statements, Plaintiff challenges the accuracy of Caterpillar's belief that he lied about his true medical condition. (Pl.'s Opposition Memo, at 3-4.) For example, Plaintiff claims that he never lifted over 30 pounds (as mandated by his medical restrictions), and insists that he played mostly a supervisory role in the roof repair. (Id.) He also points out that the Caterpillar employees involved in the termination decision lacked medical training, and that he ultimately underwent surgery. (Id. at 4.) This argument, however, misses the mark; indeed, the accuracy of Caterpillar's conclusion is irrelevant in resolving a claim of pretext.
 
 
 50
 There is a "fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment." Schultz v. General Elec. Capital Corp., 37 F.3d 329, 334 (7th Cir.1994) (quoting Kralman v. Illinois Dep't of Veterans' Affairs, 23 F.3d 150, 156 (7th Cir.1994). The court does not determine pretext by evaluating the correctness or desirability of reasons offered for employment decisions. Rather the court must consider whether the employer honestly believed in the proffered explanation. McCoy v. WGN Continental Broad. Co., 957 F.2d 368, 373 (7th Cir.1992).
 
 
 51
 As previously noted, Caterpillar fired Wagner based on an honest belief that he was lying to the company. The possibility that Caterpillar was mistaken in assessing Wagner's physical capabilities has no bearing on the issue of pretext because the court will not second-guess Caterpillar's business judgment. See McCoy, 957 F.2d at 373 ("the court does not sit as a super personnel department that reexamines an entity's business decision"). In sum, Wagner has simply failed to raise a genuine factual issue as to whether Caterpillar impermissibly considered his back condition in deciding to terminate his employment.
 
 B. Plaintiff's Retaliation Claim
 
 52
 Plaintiff also alleges that he was discharged in retaliation for filing workers' compensation claims against the company in December 1987 and June 1993.[13] To establish a claim of retaliatory discharge under Illinois law, a plaintiff must establish that: (1) he was the defendant's employee before his injury; (2) he exercised a right granted by the Workers' Compensation Act ("Act"); and (3) his discharge was causally connected to his filing a workers' compensation claim. Sweat v. Peabody Coal Co., 94 F.3d 301, 304 (7th Cir.1996). The parties do not dispute that Wagner was an employee of Caterpillar when he was injured, or that he pursued workers' compensation benefits under the Act. The only question is whether Plaintiff has shown the necessary causal connection.
 
 
 53
 Wagner must affirmatively show that his discharge occurred primarily in retaliation for filing his 1987 and 1993 workers' compensation claims or receiving benefits thereunder. Roger v. Yellow Freight Sys., Inc., 21 F.3d 146, 149 (7th Cir.1994). The necessary causal relationship will not be satisfied if the employer's explanation for the discharge is valid and nonpretextual. Hartlein v. Illinois Power Co., 151 Ill.2d 142, 601 N.E.2d 720, 728 (1992). The critical inquiry is whether the decision-makers were prompted by a retaliatory intent or motive at the time of the employment action. Roger, 21 F.3d at 149. A claim of retaliatory discharge will not stand where the plaintiff fails to show the employer's intent to retaliate. Armstrong v. Freeman United Coal Mining Co., 112 Ill.App.3d 1020, 446 N.E.2d 296, 298 (3d Dist.1983).
 
 
 54
 1. Plaintiff's 1987 Workers' Compensation Claim
 
 
 55
 As Defendant urges, Plaintiff has presented no evidence supporting an inference that Caterpillar discharged him because of his 1987 claim. (Def.'s Memo, at 13.) Nothing suggests, for example, that Tunt or Mulvaney considered Wagner's 1987 claim or his receipt of benefits when making the decision to terminate his employment. Wagner himself admits that Caterpillar representatives neither made reference to his claim or receipt of benefits, nor took any adverse action against him after his claim was filed. (Wagner Dep., at 66-67.) See Horton v. Miller Chemical Co., 776 F.2d 1351, 1357 (7th Cir.1985) (in reversing summary judgment for the plaintiff, the court noted that none of the defendant's employees ever said anything to the plaintiff about filing a workers' compensation claim).
 
 
 56
 Rather, Caterpillar gave Wagner time off from work to recover, paid him during his time off, and reimbursed him for his medical expenses. (Def.'s 12(M) Statement p 40.) In fact, Wagner remained an employee at Caterpillar for another five and a half years after filing the claim, and he did not even receive workers' compensation benefits during the two years immediately preceding his discharge. See Roger, 21 F.3d at 151 (inference that the plaintiffs employer had a retaliatory motive in firing him was not reasonable "in light of the fact that [the plaintiff] was retained for a year and a half after his injury"); Bush v. Commonwealth Edison Co., 990 F.2d 928, 934 (7th Cir.1993) (inference that the employer "hatched an elaborate plot" to get rid of the plaintiff a year and a half after he filed his workers' compensation claim was too speculative to support a finding that the firing resulted from the filing of that claim).
 
 
 57
 Plaintiff argues that Carhill's statement that Wagner "complain[ed] a lot about any job" to which he was assigned demonstrates Defendant's retaliatory motive. (Pl.'s Opposition Memo, at 5; Carhill Dep., at 28.) Most significantly, however, Carhill made this comment at his deposition, years after Plaintiff filed his 1987 claim and well after his discharge. Even assuming a retaliatory animus on the part of Carhill (but see supra note 11), Plaintiff cannot show that the ultimate decision-makers were influenced by Carhill's motives. Plaintiff has presented no evidence indicating that Carhill discussed Wagner's 1987 claim, or attendant receipt of benefits, with Tunt or Mulvaney at any point during the termination process. Carhill had no part in finalizing the decision to fire Wagner (Def.'s 12(M) Statement p 21); see Bush, 990 F.2d at 934 (remark of plaintiff's supervisor is not evidence of a retaliatory motive where "the supervisor who made the remark in question had nothing to do with the decision to fire him"), and Carhill's mere recommendation is insufficient to raise an inference of discrimination on the part of Mulvaney and Tunt absent evidence that Carhill in some way tainted the decision-making process. See Hiatt v. Rockwell Int'l Corp., 26 F.3d 761, 769 (7th Cir.1994) (plaintiff "failed to show that those in charge of his actual discharge possessed an impermissible ulterior motive" where there was no evidence that his supervisor's animosity towards him influenced the decision).
 
 
 58
 Plaintiff cites two cases, Bilderback v. Admiral Co., 227 Ill.App.3d 268, 591 N.E.2d 36 (3d Dist.1992), and Netzel v. United Parcel Serv., Inc., 181 Ill.App.3d 808, 537 N.E.2d 1348 (1st Dist.1989), in support of his contention that Mulvaney's remarks[14] evidence Defendant's retaliatory motive. The court, however, finds these two cases unpersuasive. In Bilderback, the plaintiff's supervisors made numerous threats to fire him because of his workers' compensation claims. 227 Ill.App.3d at 271, 591 N.E.2d at 159. The employer maintained that it fired the plaintiff because he shoved a supervisor and lied to the company nurse. Id. The court found the evidence conflicting but sufficient enough to uphold the jury verdict in favor of the plaintiff. Id. In this case, conversely, neither Mulvaney nor Carhill threatened Wagner with termination because of his pursuit of workers' compensation benefits. In fact, neither man's statements made any reference to either of his workers' compensation claims at all.
 
 
 59
 In Netzel, the plaintiff was fired a few months after the sole decision-maker described his injury as "crap" and "bullshit," and stated that the plaintiff "should have returned to work long before then." 181 Ill.App.3d at 813-14, 537 N.E.2d at 1351. The court stated that a reasonable jury could have concluded that the supervisor terminated the plaintiff because he was exercising his statutory rights, not because he believed the plaintiff was feigning his injury as suggested by the defendant. Id. Unlike these remarks, Mulvaney's statements cannot be characterized as openly hostile, nor did they challenge the legitimacy of Wagner's injury. In addition, Mulvaney's remarks preceded Wagner's dismissal by a greater period of time (nine months) than those in Netzel (four months). Finally, Mulvaney was only one of two individuals responsible for Wagner's discharge. (Def.'s 12(M) Statement p 21.)
 
 
 60
 Wagner again attempts to support his argument by attacking the credibility of Defendant's beliefs regarding his physical capabilities. (Pl.'s Opposition Memo, at 3-4.) Specifically, Wagner points to Mulvaney's comments, evidence that Caterpillar was mistaken about his true medical condition, and Carhill's suspicions which led him to hire a surveillance team. (Id.) The court has already considered this evidence and concluded that it does no more than call into question Caterpillar's business judgment. Evidence that is insufficient to establish pretext under the ADA is likewise insufficient to establish a retaliatory motive. Compare Russell, 51 F.3d at 68 (to prove unlawful discrimination under the ADA, the plaintiff must establish that the employer's proffered explanation is pretextual) with Hartlein, 151 111.2d at 160, 601 N.E.2d at 728 (causal relationship between the plaintiff's termination and filing of workers' compensation claim does not exist where the employer offers a valid, nonpretextual reason for the discharge). The evidence here does not support the notion that the decision to discharge Wagner in 1993 was a response to his 1987 workers' compensation claim.
 
 
 61
 2. Plaintiff's 1993 Workers' Compensation Claim
 
 
 62
 Plaintiff's assertion that his discharge was motivated by the 1993 claim also fails because of his inability "to demonstrate the requisite causal relationship. In order to state a claim for retaliatory discharge when no workers' compensation claim has been filed, the employer must at least be aware of the employee's intention to file such a claim. Sweat, 94 F.3d at 305; Carter v. GC Elecs., 233 Ill.App.3d 237, 241,599 N.E.2d 11, 13 (2d Dist.1992). See also Roger, 21 F.3d at 149 ("[f]actual support that the employer was informed of or in some way found out about the plaintiff's intent to pursue relief under the Act is essential to a retaliatory discharge action"). As Caterpillar contends, the there is no basis here to infer that Caterpillar managers knew of Wagner's intention to pursue workers' compensation benefits when they decided to fire him. (Def.'s Memo, at 15; Def.'s 12(M) Statement p 27.) Indeed, Wagner never inquired about benefits or informed anyone at Caterpillar that he was even considering filing a claim at any time prior to his discharge. (Def.'s Memo, at 15.)
 
 
 63
 Nor is there evidence, Defendant notes, that Caterpillar actually believed Wagner would file a workers' compensation claim. (Id.) As described above, Wagner's evidence that he complained of a new injury in 1992 is negligible. The disability forms Wagner completed in connection with the August 1992 injury state that an accidental injury occurred in 1987, not 1992. (Pl.'s 12(N) Statement p 8-10.) Similarly, the information Carhill provided to the surveillance firm in June 1993 reveals that he believed Wagner's injury occurred in 1987. (Id. p 15, 16.) Furthermore, Wagner suggests that between August 1992 and April 1993, even he did not believe that he was hurt. Only when Caterpillar recalled him to work in April 1993 did Wagner consider filing a claim. (Pl.'s 12(N) Statement p 31.) Indeed, Wagner did not actually file a claim until June 21, 1993, ten months after suffering the alleged injury. See Roger, 21 F.3d at 150 (the plaintiff's decision to wait an entire year and a half before filing his claim "would lead [the employer] to believe ... that [the plaintiff] was not going to file a claim").
 
 
 64
 Both Tunt and Mulvaney stated that they were unaware of Wagner's intention to file a claim, and Plaintiff has presented no evidence that Carhill or Peterson discussed that possibility during the termination process.[15] (Def's 12(M) Statement p 30.) See Sweat, 94 F.3d at 305 (upholding summary judgment for the employer where "there is no evidence in the record that [the employer] knew or even suspected that [the plaintiff] might file a workers' compensation claim").
 
 
 65
 Wagner relies on the statements of Dr. Lorenz and a nurse employed at Caterpillar, as well as a bill he received from the Aurora MRI Center, as further evidence of Caterpillar management's knowledge that he intended to file for workers' compensation benefits. (Pl.'s Opposition Memo, at 5-6.) Notably, however, Wagner offers only his own recollection that Dr. Lorenz and the nurse made such statements, and presents no evidence imputing the personal knowledge of these medical professionals to the managers who terminated his employment. For similar reasons, the reference to workers' compensation that appears in Wagner's May 1993 medical bill cannot be relied on as evidence that Caterpillar managers knew of Wagner's intention to file a workers' compensation claim the following month.
 
 
 66
 Wagner also asserts that Mulvaney knew of his intent to file for workers' compensation because he knew of Wagner's new 1992 injury. According to Plaintiff, he told Mulvaney in August 1992 that he had "hurt" his back while picking up some parts in the light-duty area. (Pl.'s Opposition Memo, at 4.) At his deposition, however, Wagner testified that he told Mulvaney merely that his back was "bothering" him and that he was experiencing "pain and discomfort." (Def.'s 12(N) Response p 1; Def.'s 12(M) Statement p 12, 35.) As Defendant correctly notes, there is a significant difference between aggravating a preexisting condition and experiencing a new injury. The court will not permit Wagner to create a factual dispute by inexplicably contradicting his earlier sworn testimony. Russell, 51 F.3d at 67. Even if the court accepted the truth of Plaintiff's claim that he notified Mulvaney of his new injury, the statement is still insufficient to support an inference that Caterpillar suspected Wagner would file for workers' compensation benefits. As previously noted, nearly a year passed between the time Wagner allegedly informed Mulvaney of a new injury and the date he actually considered filing such a claim.[16] (Def.'s 12(M) Statement p 30; Pl.'s 12(M) Response p 30.) Wagner has offered nothing to refute Caterpillar's showing that Wagner's termination was based on the honest belief that Wagner was lying to the Company, not on any suspicion that Wagner was about to file a workers' compensation claim.
 
 CONCLUSION
 
 67
 Plaintiff has failed to demonstrate that Defendant terminated his employment because of its discriminatory or retaliatory motive. Defendant's assertion that it fired Plaintiff due to his dishonesty finds ample support in the record, and Plaintiffs claims of pretext are without factual basis. Thus, Defendant's motion for summary judgment on Counts I and II of Plaintiff's amended complaint is granted.
 
 
 
 [1]
 This court granted appellant's motion to waive oral argument
 
 
 [1]
 The following statement of facts is drawn from the parties' Local Rule 12(M) and 12(N) statements, as well as pertinent documents attached thereto
 
 
 [2]
 Carhill testified that he questioned Wagner's roofing activities because Wagner "complain[ed] a lot about any job" to which be was assigned. (Carhill Dep., at 28-29.)
 
 
 [3]
 Defendant claims that David Peterson, Aurora Personnel Services Manager at the time, accompanied Carhill when he viewed the videotape and showed it to Dr. Neu. (Def.'s 12(M) Statement p 20.) Plaintiff correctly notes, however, that the record does not support this contention. (l.'s 12(M) Response p 20.) Peterson testified only that he viewed the videotape sometime before attending the meeting to discuss Wagner's future employment (Peterson Dep., at 51; see infra p. 8); he does not recall discussing the videotape with Dr. Neu prior to that meeting. (Peterson Dep., at 48.)
 
 
 [4]
 Plaintiff denies the truth of this contention, but he fails to offer any supporting evidence from appropriate record authorities. (Pl.'s 12(M) Response p 22.) This circuit has consistently enforced the requirements under Local Rule 12. Waldridge v. American Hoechst Corp., 24 F.3d 918, 922-23 (7th Cir.1994). Factual assertions in the moving party's statement are deemed admitted when uncontroverted in the non-moving party's response. LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 389 (7th Cir.1995). Thus, Defendant's assertion must be taken as true
 
 
 [5]
 Plaintiff claims that the decision to terminate Wagner's employment was based only on the videotape and medical restrictions. (Pl.'s 12(N) Statement p 29.) However, the record supports Defendant's contention that Dr. Neu's opinion was also a factor. The ultimate decision-makers, Tunt and Mulvaney, both stated that they relied on Dr. Neu's report as relayed to them by Carhill. (Mulvaney Dec. p 6, Ex. 6 to Def.'s Motion; Tunt Dec. p 6, Ex. 5 to Def.'s Motion.)
 
 
 [6]
 Plaintiff initially denies that his restrictions resulted from the 1987 back injury (Pl.'s 12(M) Response p 17), yet he agrees with Defendant's contention that in 1993, before his termination, his work restrictions resulted from this very injury. (Id. p 18.) Thus, Plaintiff admits the identical proposition in Paragraph 18 of Defendant's 12(M) Statement that he denies in the previous paragraph. Furthermore, Plaintiff himself testified that the restrictions last imposed on him stemmed from the 1987 back injury. (Wagner Dep., at 42.)
 
 
 [7]
 Defendant states that it lacks knowledge and information sufficient to admit or deny this contention. (Def.'s 12(N) Response p 31.) Because such a response has the effect of admitting the facts asserted, see Davis v. Frapolly, 756 F.Supp. 1065, 1069 (N.D.Ill.1991), Plaintiff's statement is deemed admitted
 
 
 [8]
 The record indicates that Dr. Lorenz discussed the videotape with Carhill on July 12, 1993, after Wagner had been discharged (Pl.'s 12(N) Statement p 24); the parties fail to reveal, however, how Dr. Lorenz obtained the tape or when he viewed the tape prior to June 21, 1993
 
 
 [9]
 Wagner makes reference to various disability benefit forms he completed, but these all indicate that he suffered an accidental injury in 1987, not 1992. (Pl.'s 12(N) Statement p 8-10.)
 
 
 [10]
 Defendant correctly points out that Plaintiff has not properly stated a claim under the ADA. The amended complaint fails to allege that Plaintiff is a "qualified individual with a disability," and his failure to do so arguably justifies dismissing this count of the complaint. However, because the case is now at the summary judgment stage, the relevant inquiry is whether Plaintiff has produced evidence of his claim, rather than whether he has sufficiently alleged it
 
 
 [11]
 Plaintiff maintains that pretext may also be found in Carhill's personal doubts about Wagner's medical condition, and Carhill's decision to hire a surveillance team. (Pl.'s Opposition Memo, at 5.) Yet Plaintiff has presented no evidence that Carhill's actions or beliefs reflected general displeasure with individuals on disability leave. To the contrary, he attempted to discover whether Plaintiff's disability was genuine only after receiving an anonymous tip suggesting otherwise. (Def.'s 12(M) Statement p 19; Pl.'s 12(N) Statement p 15.)
 
 
 [12]
 The court notes that Plaintiffs reliance on Mulvaney's statement regarding the requirements of light duty employees may be improper as a matter of law because he mentioned this statement for the first time in an affidavit that contradicted his earlier deposition testimony. (Wagner Dep., at 69.) "Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment." Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir.1993); Russell, 51 F.3d at 67 (noting that the Seventh Circuit is "highly critical" of affidavits prepared subsequent to depositions) (collecting cases). However, because conflicts between depositions and affidavits may be explained by plausible lapses of memory, the court nonetheless considers this evidence. Russell, 51 F.3d at 67-68
 
 
 [13]
 In his amended complaint, Plaintiff charges that Defendant fired him in retaliation for filing his 1993 claim. (Amended Complaint p 4-7.) Plaintiff's averment would be impossible to prove because he did not file his 1993 claim until after Defendant terminated his employment. Thus, Plaintiff's discharge could not have been motivated by the actual filing of this claim. See Sweat v. Peabody Coal Co., 94 F.3d 301, 305 (7th Cir.1996) (plaintiff terminated prior to filing a workers' compensation claim could not have been fired because of the filing). As Sweat recognizes, however, a plaintiff may prove unlawful retaliation if he can show that his employer took action against him because the employer knew he intended to file a claim. This court will liberally construe plaintiff's complaint in this vein
 
 
 [14]
 In advancing his retaliatory. discharge claim, Plaintiff relies on the same statements he used to prove Caterpillar's discriminatory motive. The court notes the inherent inconsistency in arguing that Mulvaney's remarks reflect both disability discrimination and retaliation
 
 
 [15]
 Plaintiff notes that the disability forms completed by him pass through Peterson's department. The court cannot speculate as to whether Peterson in fact saw any of Plaintiff's disability forms. The inference that Plaintiff seeks, i.e. that Defendant must have known of his intent to file a workers' compensation claim because Peterson participated in the termination process, is not reasonable
 
 
 [16]
 Plaintiff further stresses that Defendant knew of his intention to file for workers' compensation benefits because he had an appointment to discuss the issue with an attorney on June 11, 1993. Because Caterpillar employees were unaware of this appointment, however, knowledge of Plaintiff's intent to file a workers' compensation claim cannot be imputed to the company